# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 07-1003

_____

In re: Denise Irene Patch,     *

                   *

       Debtor.       *

                   *

_____     *

                   *

Bryan Blocker, Trustee for the   *

Heirs and Next-of-Kin of Dillon   *       Appeal from the United States

Bryan Blocker,             *       Bankruptcy Appellate Panel of the

                   *       Eighth Circuit.

       Appellee,       *

                   *            [PUBLISHED]

    v.                *

                   *

Denise Irene Patch,        *

                   *

       Appellant.      *

_____

Submitted: November 16, 2007
Filed: May 29, 2008

_____

Before MURPHY, HANSEN, and GRUENDER, Circuit Judges.

_____

HANSEN, Circuit Judge.

Denise Patch appeals the judgment of the Eighth Circuit Bankruptcy Appellate Panel (BAP). A divided BAP affirmed the bankruptcy court's *sua sponte* entry of summary judgment in favor of Bryan Blocker, Trustee for the heirs and next of kin of

Dillon Blocker, concluding that Patch's unliquidated debt, owed to Blocker, is nondischargeable under 11 U.S.C. § 523(a)(6). Because we conclude that Patch's debt is dischargeable as a matter of law, we reverse.

## I.

This bankruptcy dispute is the product of the extremely tragic death of Patch's and Blocker's three-year old son, Dillon, who was murdered by Patch's live-in boyfriend, Steven McBride.[1] In March of 2001, Patch and McBride began dating. Soon thereafter, the couple leased a two-bedroom apartment in Lakeville, Minnesota, and began living together. Patch had two children from her prior relationship with Bryan Blocker–Dillon and a five-year-old daughter. Both children lived in the Lakeville apartment with Patch and McBride. Patch worked at a daycare center that both children attended. Dillon also participated in speech-therapy programming administered by the local school district.

Shortly after Patch and McBride leased the Lakeville apartment, McBride began physically abusing Dillon. Patch, who had received training in identifying and reporting child abuse, knew that McBride was abusing her son, and she asked him to stop. But McBride did not stop abusing Dillon, and Patch did nothing more to prevent the abuse. Eventually, daycare personnel suspected that Dillon was being abused. When Patch was questioned by coworkers about Dillon's bruises, she removed her children from daycare and quit her job there. Patch also regularly cancelled Dillon's speech-therapy classes to hide his visible bruising, and eventually, she removed Dillon from his speech program to prevent discovery of the abuse. After quitting her daycare job, Patch began working nights at Target. When Patch went to work, she left her children at home with McBride.

---

[1]We recite the facts in the light most favorable to Blocker, the nonmovant, consistent with our summary judgment standard of review. See Williams v. Malar (In re Marlar), 267 F.3d 749, 755 (8th Cir. 2001) (standard of review).

On September 17, 2001, Patch went to work at Target and left her children at the apartment in McBride's care. Sometime early in the morning while Patch was at work, McBride called her to tell her that Dillon was crying and had hurt himself in a fall. Patch left Target early and went home to check on Dillon. When Patch arrived home, she noticed a bruise on Dillon's forehead. While putting ice on Dillon's head, Patch also observed that Dillon was having difficulty breathing and was not speaking normally. More than once, Patch told McBride that she thought they should take Dillon to see a doctor, but McBride told her that consulting a doctor was not necessary. Instead, they put Dillon to bed and did nothing further. When Patch awoke in the morning, she checked on Dillon and found him dead. Patch called 911.

The autopsy report prepared by the Dakota County Coroner indicates that Dillon died from blunt-force injuries to his head and abdomen. Acute injuries to Dillon's head resulted in bleeding on the surface of his brain and mild swelling of his brain. Dillon's acute injuries to his abdomen included bruising of his pancreas and liver. The report also revealed an acute, small-bowel rupture and bleeding in the peritoneal cavity. Dillon's older injuries included: bruises and abrasions on his chest and arms consistent with human bite marks; multiple broken ribs in varying stages of healing; burn marks on his right arm and hand; and a knocked-out tooth that he had swallowed.

Both McBride and Patch were criminally charged. McBride was convicted of murder and sentenced to life in prison without the possibility of parole. Patch pled guilty to second-degree manslaughter (a form of criminal negligence), see Minn. Stat. § 609.205, subd. 5, and she was sentenced to 96 months of imprisonment, double the presumptive sentence. Her sentence was enhanced on the basis of aggravating factors, including Dillon's vulnerability and her failure to obtain medical care for Dillon the night before his death. See State v. Patch, No. C7-02-1333, 2003 WL 1481302 (Minn. Ct. App. Mar. 25, 2003).

In December of 2003, Blocker, acting as the court-appointed trustee for Dillon's heirs and next of kin, filed a wrongful-death action against McBride and Patch in Minnesota state court. Count II of that action alleges that Patch negligently entrusted Dillon to McBride, and Count III alleges that Patch negligently failed to seek medical care for Dillon prior to his death. Both counts allege that Patch's negligent conduct was the proximate cause of Dillon's wrongful death. In contrast to the count against McBride, which alleges that he intentionally assaulted Dillon and thereby caused his death, the counts against Patch allege only negligence and carelessness; no intentional tort is alleged, neither is willfulness. Patch filed for relief under Chapter 7 of the Bankruptcy Code and listed Dillon's estate as one of her creditors. The wrongful-death action was stayed. Blocker then filed a complaint in the bankruptcy court seeking a declaration that Patch's obligation is nondischargeable because it is a debt "for willful and malicious injury" under § 523(a)(6). Patch filed a motion for summary judgment, and after a hearing, with no written memorandum, the bankruptcy court denied Patch's motion and granted Blocker summary judgment *sua sponte*. On appeal, a divided BAP affirmed. Patch appeals. Blocker elected to take no part in these appellate proceedings.

## II.

The sole issue on appeal is whether the bankruptcy court and the BAP both erred by concluding that Patch's debt, resulting from her role in Dillon's death, is nondischargeable as a matter of law. Patch contends that the summary judgment record is insufficient, as a matter of law, to permit a rational trier of fact to find for Blocker, and therefore she is entitled to summary judgment. We agree.

Like the BAP, we review the bankruptcy court's entry of summary judgment *de novo*. See Marlar, 267 F.3d at 755. Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex v. Catrett, 477 U.S. 317, 322-23 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal marks omitted). While we view the record in the light most favorable to the nonmoving party and afford that party all reasonable inferences, see id. at 587, the nonmoving party's production of a mere "scintilla of evidence" in support of his position is insufficient to avoid summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Matsushita, 475 U.S. at 586 (explaining that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts").

Section 523(a) of the Bankruptcy Code exempts certain debts from discharge in bankruptcy, including debts "for willful and malicious injury by the debtor to another entity." To establish that a debt is nondischargeable consistent with this exception, the party seeking to prevent discharge must show by a preponderance of the evidence that the debt is for both "willful . . . injury" and "malicious injury." Id.; see Fischer v. Scarborough (In re Scarborough), 171 F.3d 638, 641 (8th Cir.) ("Willful and malicious are two distinct requirements . . . ."), cert. denied, 528 U.S. 931 (1999).

The meaning of "willful" under § 523(a)(6) is controlled by the Supreme Court's decision in Kawaauhau v. Geiger, 523 U.S. 57 (1998).[2] There, the Court resolved a circuit split over the meaning of "willful," holding that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." Id. at 64. Because the word "willful" in § 523(a)(6) modifies the word "injury," the Court concluded that "nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." Id.

---

[2] Because we conclude that the summary judgment record is insufficient as a matter of law to permit a rational trier of fact to find that Patch's debt is "for willful . . . injury" under § 523(a)(6), we do not address the statute's "malicious injury" element.

at 61. Like the en banc Eighth Circuit decision it affirmed, the Court relied on the Restatement (Second) of Torts, observing that "the [§ 523](a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' . . . . [which] generally require[s] that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'" Id. at 61-62 (quoting the Restatement (Second) of Torts § 8A cmt. a (1964)).

The scope of "willful . . . injury" under § 523(a)(6), however, is not limited to circumstances in which the debtor desires to bring about the consequences of his conduct. If the debtor knows that the consequences are certain, or substantially certain, to result from his conduct, the debtor is treated as if he had, in fact, desired to produce those consequences. Geiger v. Kawaauhau (In re Geiger), 113 F.3d 848, 852 (8th Cir. 1997) (en banc) (citing the Restatement (Second) of Torts § 8A, cmt. a (1965)), aff'd, 523 U.S. 57 (1998). Our Geiger opinion makes clear that in this circuit the "willful" element is a subjective one, requiring proof that the debtor desired to bring about the injury or was, in fact, substantially certain that his conduct would result in the injury that occurred. See id. at 852-54 ("There is nothing in the record . . . that would support a finding that Dr. Geiger *believed* that it was substantially certain that his patient would suffer harm. . . . Even if Dr. Geiger should have believed that his treatment was substantially certain to produce serious harmful consequences, he would be guilty only of professional malpractice, not of an intentional tort.").

We begin our application of this legal authority by clarifying the scope of our inquiry under § 523(a)(6). That provision exempts "debts . . . for willful and malicious injury by the debtor." The plain language of § 523(a)(6) requires courts applying the exemption to first determine exactly what "injury" the debt is "for," and then determine whether the debtor both "willful[ly] and malicious[ly]" caused that "injury." Here, the specific debt Patch seeks to discharge is her unliquidated obligation to Blocker in the wrongful-death action, and the injury that gives rise to that debt is Dillon's wrongful death. Contrary to the BAP's analysis, Patch's debt is

not "for" her role in the prior abuse that Dillon suffered. The BAP erred by conflating Patch's continued acquiescence in that prior abuse with her role in Dillon's ultimate death. See, e.g., Blocker v. Patch (In re Patch), 356 B.R. 450, 458 (B.A.P. 8th Cir. 2006) ("The next issue as to willfulness is whether the Debtor subjectively knew that Dillon's injuries were substantially certain to occur from her actions and inactions . . . . We believe that [the dissenting opinion] too narrowly focuses the inquiry on the events of the night that Dillon died. We disagree, concluding instead that it is appropriate to look at the entire series of events surrounding the abuse . . . ."). Thus clarified, to prove that Patch's debt is "for willful . . . injury" under § 523(a)(6), Blocker is required to prove by a preponderance of the evidence either that Patch desired to bring about Dillon's death as a consequence of her conduct in the time frame just prior to his death or that Patch was substantially certain that Dillon would die as a consequence of that conduct.

The BAP concluded that the summary judgment record conclusively establishes that Patch acted or failed to act with the intention of bringing about Dillon's death. The BAP based its conclusion on the following undisputed facts: Patch knew that McBride was abusing Dillon; Patch removed Dillon from daycare and speech therapy in order to prevent discovery of the abuse; she continued to leave Dillon in McBride's care and did so on the night Dillon was killed; the autopsy report establishes that prior to the final assault Dillon suffered severe abuse that resulted in extensive bruising all over Dillon's body, broken ribs, burn marks on his right hand and arm, and a knocked-out tooth; and finally, in the night-time hours prior to Dillon's death, Patch observed that he was having difficulty breathing and talking, but did nothing to obtain medical care for her son. Insofar as the BAP focused its analysis on any particular action or omission, as opposed to "the entire series of events surrounding the abuse," id. at 458, the BAP based its conclusion that Patch's debt is for "willful . . . injury" on Patch's decision to leave Dillon with McBride the night preceding his death and Patch's failure to summon medical care early on the morning of his death. Id.

As an abstract legal matter, the BAP concluded that the failure to act in the face of a duty can constitute an intentional tort. But we question whether a debtor's breach of a legal duty to act can ever constitute a "willful . . . injury," as the Supreme Court and this circuit have interpreted § 523(a)(6) consistent with the Restatement (Second) of Torts. The Restatement appears to take the categorical position that the failure to act in the face of a legal duty can never constitute an intentional tort. "The Restatement speaks only of an act (not of an omission) in defining intent, in § 8A, and requires an act, as distinguished from inaction, for battery . . . ." W. Page Keeton et al., Prosser and Keeton on Torts § 8, at 36 n.6 (5th ed. 1984). Correspondingly, the Restatement characterizes an actor's deliberate breach of a legal duty to protect as negligence. Id. On the other hand, while the Supreme Court's decision in Geiger, and our en banc decision, relied on the Restatement in interpreting the meaning of "willful . . . injury" under § 523(a)(6), neither decision requires strict adherence to every particular of the Restatement, and neither decision can be read for the broad rule that a debtor's breach of a legal duty to act can never be "willful" under § 523(a)(6). The propriety of any such categorical rule is questionable. See Keeton, supra, § 8, at 36 n.6 ("This curious usage is confounding, since there is as clear a distinction (1) between purposely failing to act, in order to produce a desired consequence, and failing to act without adverting to that consequence, as (2) between purposely acting to produce a desired consequence and acting without adverting to that consequence."). In any event, we need not conclusively resolve these abstractions here. As we explain below, it is enough to say that no rational trier of fact could find that Patch's action or inaction was "willful" based on the summary judgment record and any reasonable inferences derived from that record.[3]

_____

[3] We note the limited development of the summary judgment record, which primarily consists of: the police report from the morning of Dillon's death; the nondescript autopsy report; the incomplete transcript of Patch's deposition; and the Minnesota Court of Appeals's recitation of the facts in its decision affirming Patch's sentence.

In concluding that Blocker was entitled to judgment as a matter of law, the BAP acknowledged that the record does not indicate that Patch desired to bring about Dillon's death, in accordance with tort law's more traditional understanding of intent. Blocker, 356 B.R. at 459 ("Even though [Patch] may not have harbored ill will toward Dillon or wanted him to die, [Patch's] conduct was inexcusable and resulted in his inevitable injuries and death."). The summary judgment record affords no basis for a rational trier of fact to find that Patch left Dillon with McBride on September 17th because she desired to bring about Dillon's death. The fact that Patch left Dillon with McBride, who had severely abused Dillon in the past, permits (if not compels) the inference that she was grossly and recklessly indifferent to the risk that McBride would abuse her son that night. But without more probative evidence of Patch's mental state, it is unreasonable to infer that she desired to kill Dillon solely from her decision to leave him with his abuser. The law of torts permits a fact finder to conclude that an actor intends the natural consequences of his actions, see Keeton, supra, § 8, at 36, but based on this record, Dillon's actual death cannot reasonably be said to be the natural consequence of her decision to leave Dillon with McBride. Likewise, the summary-judgment record affords no basis for a rational trier of fact to find that Patch refrained from obtaining medical assistance for Dillon because she desired to bring about his death. Generally, inferring an actor's intent from that actor's inaction is rife with speculation; there are any number of reasons for an actor's inaction, reasons that may have nothing to do with intending the ultimate consequences of the inaction. On this summary judgment record, the most a rational trier of fact can infer from Patch's inaction, without engaging in undue speculation, is that she was grossly and recklessly indifferent to her suffering son. "[R]eckless or negligent conduct is not sufficient to show willfulness" under § 523(a)(6). Siemer v. Nangle (In re Nangle), 274 F.3d 481, 483 (8th Cir. 2001).

We also find no basis in this summary judgment record on which a rational trier of fact could conclude that Patch was "substantially certain" that her action or inaction would result in Dillon's death. See Geiger, 113 F.3d at 853. Because Dillon's death

resulted primarily from McBride's abuse, to show that Patch was substantially certain that by entrusting Dillon to McBride, Dillon would die as a result, Blocker must point to facts in the record indicating that Patch knew that McBride intended to either kill Dillon or so abuse him that he would later die as a result of the abuse. If she did not know that McBride would abuse Dillon that night, a rational trier of fact could hardly find that she entrusted Dillon to McBride's care with a substantial certainty in her mind that Dillon would die as a result. There is nothing in the record from which to infer such knowledge on the part of Patch. The fact that McBride had abused Dillon in the past may have made it probable that McBride would abuse Dillon again on this particular occasion, but a rational fact finder cannot infer that Patch was substantially certain that Dillon would die based solely on the risk or likelihood that McBride would abuse him that evening.

Finally, we find nothing in this record that would support a finding that Patch was substantially certain that Dillon would die as a result of her failure to summon medical help on the morning of Dillon's death. Even when construed most favorably to Blocker, the record only indicates that: Patch knew Dillon had been abused before; Patch knew that the prior abuse was severe; Patch observed a bruise on Dillon's head; Patch noticed that Dillon had difficulty breathing and speaking normally; and she thought that Dillon should see a doctor. These facts have little bearing on Patch's knowledge of Dillon's actual medical condition on the morning of Dillon's death, and they are insufficient to support the speculative inference that Patch was *substantially certain* that Dillon would die without immediate medical attention. These facts also do not indicate that Dillon's visible injuries were so objectively life threatening that anyone, even someone with minimal medical training, would have been substantially certain that Dillon would die from the observable injuries. Illustratively, the autopsy report shows that Dillon's death resulted primarily from internal injuries to his head and abdomen, not wounds that were visible to Patch. We conclude that no rational trier of fact could find, on the basis of this limited summary judgment record, that

-10-

Patch was substantially certain that Dillon would die as a result of her failure to obtain medical assistance for the boy.

Because the record taken as a whole could not lead a rational trier of fact to find that Patch either desired to bring about Dillon's death as a result of her conduct or was substantially certain that Dillon's death would result from her conduct, we conclude as a matter of law that Patch's unliquidated debt in the wrongful-death action is not "for willful . . . injury." § 523(a)(6). Patch's debt is therefore dischargeable. We reverse the BAP's judgment and remand to the BAP with instructions to remand to the bankruptcy court for the entry of summary judgment in favor of Patch.

_____