In re Louis Kenneth NYBERG, Kathleen Mary Lausche, Debtors.

Timothy Guzick, as Personal Representative of the Estate of George J. Nyberg and as Trustee of the George J. Nyberg Trust, Plaintiff,

v.

Louis K. Nyberg and Kathleen M. Lausche, Defendants.

Bankruptcy No. 10–61146. Adversary No. 11–6004.

United States Bankruptcy Court, D. Minnesota.

Oct. 12, 2011.

---

Lori J. Beck, Peloquin & Minge PA, Perham, MN, for Plaintiff.

Michael R. Ruffenach, Ruffenach Law Office, Bemidji, MN, for Defendants.

## ORDER FOR JUDGMENT OF NONDISCHARGEABILITY

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter came before the Court on the plaintiff's complaint under 11 U.S.C. § 523(a)(6).[1] Lori Beck appeared on behalf of the plaintiff, Timothy Guzick, as personal representative of the estate of decedent George J. Nyberg and as trustee of the George J. Nyberg Trust. Michael Ruffenach appeared on behalf of the defendants, debtors Louis K. Nyberg and Kathleen M. Lausche. At the conclusion of the trial, the Court took the matter under advisement. Being now fully advised, the Court now makes this Order pursuant to the Federal and Local Rules of Bankruptcy Procedure.

## FINDINGS OF FACT

Much of the testimony in this trial was about relationships and conflicts between the debtor-defendant Louis K. Nyberg, and members of his family, or as between other family members, over many years preceding and including the central events of this adversary proceeding. The history of the parties and related persons was, however, an exercise necessary to establish character because, at many times in this case, credibility controlled the Court's conclusion about important factual matters.

Without careful attention to credibility, the Court would have been left with some contrary factual assertions about material issues. The preponderance of the evidence weighs heavily and determinatively one way in any event, but, the overwhelming lack of credibility of several witnesses, including the debtor-defendant Louis Nyberg, renders the outcome unequivocal.

After a thorough review of the record, including a lengthy consideration of the testimony, exhibits, and depositions, and reflection upon the demeanor of witnesses and the interests of the participants to this litigation, the Court makes these factual findings with certainty and based upon an abundance of caution and clarity.

George Nyberg was an industrious and conservatively sensible person. Over his lifetime, he elected to be frugal and made sound financial decisions and investments. By the time of his retirement from a modest background and a lifelong career in the lumber business, he was comfortably well off with substantial savings. He believed in hard work and family ties, though he had no children of his own, and though generous, George did not generally speak openly about his finances, assets, or testamentary intentions. He was private in this way and handled his financial affairs with sophistication and success. He was intelligent and entirely lucid well into old age.

---

1. On plaintiff's motion for summary judgment, the Court ruled in favor of the defen-

dants on the claim under 11 U.S.C. § 523(a)(4).

The eldest of several children, George maintained close ongoing relationships with his siblings, in-law siblings, and their children, even though many had moved away from the Chicago area from where the family originated to areas of Minnesota. The plaintiff in this matter, Tim Guzick, is George's nephew. Tim and George were close since Tim was young. In 1997 when George's wife died, Tim and George spent more time together, both residing in the Chicago area, including weekly dinner and regular outings, as well as Tim stepping in to provide care for George as needed such as preparing to go out, taking him to doctor appointments, etc. Tim described George as his uncle and best friend. Tim did not know that he was one of George's heirs until after George's death.

In November 2006, George Nyberg moved from his home in Chicago to the home of his brother, Louis Nyberg, Sr., on Midge Lake in Minnesota. George was very close to his brother, Louis Nyberg, Sr., and Louis Nyberg, Jr., hereinafter "Louis," was George's godchild. Tim encouraged George to make the move, and remained in contact with him by weekly telephone conversations. George was cheerful and talkative during his phone visit with Tim, until some time after George's brother, Louis Sr., died.

George's godson Louis, the debtor-defendant here, is and has been for as long as all but his mother and current wife can recall, a classic charlatan.[2] The Court does not make such a finding lightly, but the extensive record in this case tells the same story over and again, except by Louis' accounts and by those persons under his control.

Louis represents himself by many names, professional titles, and ethnic heritages.[3] He has at one time or another falsely reported to his family and friends that he is a surgical nurse or a doctor, a professional chess master, enrolled in medical school, or in a privileged position at the Mayo Clinic. He would drive expensive cars and wear scrubs and a stethoscope to make his appearance lend support to his pretended advancing career. He has also claimed a variety of serious illnesses requiring expensive medical treatments. He has claimed family ties with

2. One other avid supporter of Louis Jr., was Arlo Feiock, long time minister to Louis Jr.'s mother. Feiock's testimony was without a shred of credibility. He conceded only a recent relationship with the debtor-defendants, and acknowledged only generally that Louis had been troubled in the past, but placed great weight on his sense that Louis was presently saved by love in his new marriage. Feiock testified at length and in great detail about the purported close relationship between George and the debtors, but his claims were exceedingly favorable to the point of theatrical. Feiock's description of George as freely discussing his financial exploits and gushing about Louis as the loving son he never had, as well as the characterization of George's last months of life as a "blessed senior transition" filled with excellent care and nourishing "relational sustenance" opposed the more measured, disinterested descriptions of George's personality and final experiences of life by numerous other witnesses. Similarly, Feiock's assessment of Louis's sister and her husband as angry and vengeful was unbelievable, and the hostility he expressed to counsel for the plaintiff betrayed his false neutrality. Finally, Feiock's extreme effervescence was more than preacher zeal; it made sense when he effusively but probably inadvertently revealed that Louis's mother was a long time supporter and major financial contributor to his ministry.

3. Louis has an affinity for claiming titles in the health care profession including various nursing and medical doctor specialties. He also appears to have a preference for an Italian persona, creating and using aliases such as Anthony or Tony D'Augustino, and Dr. Fertelli. He has also been known by his sister's married surname, Storz.

organized crime syndicates, and falsely claimed to have completed chemical abuse treatment.

His representations were invariably made in order to convey either an impression of status or accomplishment, or sympathy, and especially in order to obtain loans or gifts, which he actually used for ordinary or extravagant personal expenses, but not for the purposes he claimed. He repeatedly failed to repay numerous loans to many family members. His parents allowed him the use of their credit cards, cashed in insurance policies, and entered into second mortgage transactions in order to keep him well funded. Louis's sister and her husband assisted Louis financially many times, often reluctantly but out of a (progressively waning) sense of hope. Louis never repaid them.

As might be expected of someone living perpetually in his own fabricated reality, Louis failed to maintain successful relationships. He is now in his fourth marriage. His living former wives and his sister are afraid of him. Louis also apparently has a volatile personality—though at trial only occasionally did he seem agitated. He also has a history of alleged violence, including domestic abuse charges for abuse upon his child from a former marriage, and an alleged incident involving his minor nephew, accusations he flatly denies even knowing as having been suggested.

In the mid–1990's, Louis was admitted for psychiatric care and suicidal intentions during a contentious breakdown of one of his marriages. During that incident, Louis's sister claims that Louis was diagnosed with depression, chemical dependency and a pathological tendency to lie and otherwise act without conscience. At trial, Louis denied that he was diagnosed, but conceded that he was informed as part of the evaluation that he was suffering from depression and borderline personality disorder.[4]

The Court makes no finding with regard to any clinical condition Louis may or may not suffer and does not hold any single fact, event or suggestion to be solely determinative. Nevertheless, the combined weight of the various circumstances as demonstrated by reliable accounts of unrelated incidents over many years, including those relevant happenings associated particularly with the events of this proceeding as set forth below, are meaningful to the credibility question. The Court finds that Louis's historical penchant for misrepresenting the truth to suit his own desires, and his failure to accept responsibility for the consequences of his actions, is an established feature of his character, and consistent with the events that took place while George was under the exclusive care, and control, of Louis and Kathleen (Louis's wife).

Following the death of Louis Nyberg, Sr., in April 2008, George continued to live in his brother's home along with Geraldine, his brother's wife. About this time, George began to pay Louis and Kathleen Lausche to take care of him. Louis is the son of the elder Louis and Geraldine. George Nyberg was 94 years old at the time, with deteriorating physical health and limited mobility.

---

4. The Mayo Clinic defines borderline personality disorder as: an emotional disorder that causes emotional instability. Symptoms include: inappropriate anger, anger escalating to violence, unstable self image or unstable sense of identity, periods of paranoia, loss of contact with reality, impulsivity, risky behaviors, frequent mood swings, intense but short episodes of anxiety or depression, substance abuse, difficulty controlling emotions, self-destructive or suicidal behavior, intense fear of being alone or of abandonment, repeated job loss and broken marriages, pattern of difficult and unstable relationships.

During this time, George informed Tim that he was often alone because Geraldine was usually living in the other house with Louis and Kathleen. He no longer talked cheerfully, and he did not want to discuss the home that Louis and Kathleen were building next door by the lake. George told Tim that he felt like a prisoner. Tim offered to bring him back to Chicago, but George declined saying he was just too old to handle a move. Tim found George to be as alert and lucid as ever, but unhappy.

During the same period of time following the death of Louis Sr., George also told his younger brother Myron that he felt like a prisoner alone in Louis Sr.'s home. Myron visited George every week after church. George often talked fondly of Tim, but did not express any happiness or satisfaction with Louis and Kathleen. George was entirely dependent upon Louis and Kathleen for his care during this time, especially after he fell and was injured in October 2008.

On April 16, 2008, George had loaned or gifted funds to Louis and Kathleen, or otherwise to a company owned by them known as Bineshii, by a check in the amount of $4,000 issued to Bineshii from a George Nyberg Trust account. The check was endorsed by Louis and deposited into a bank account held by Louis and Kathleen. Louis claims that George gave him the funds to contribute to funeral expenses for Louis Nyberg, Sr. Louis does not recall what he did with the funds.

Prior to that time, George loaned substantial funds to Louis and Kathleen, or to their company Bineshii. The funds were to help, at least in part, with construction of a lake house. On April 18, 2007, George noted partial repayment on a loan to Louis:

*I Bowered [sic] Louis Nyberg Jr. 77,000.00 He gave me a check for 19,500.00 for the 4/20/07 Leaving a Balance of 57,500.00 Paid [crossed out] George Nyberg [signature] I gave Louis Nyberg 80,000.00 for house.*

The $77,000 funds related to the "house" loan are evidenced by two transactions. On March 20, 2007, George closed out two certificates of deposit at LaSalle Bank in the amount of $69,426.27. On April 23, 2007, a check in the amount of $7,574, payable to Bineshii, cleared a George Nyberg Trust account. The certificates and the check total approximately $77,000.

The partial repayment is supported by a new certificate of deposit opened on May 8, 2007, in the amount of $20,000. There is no evidence in the record that Louis or Bineshii repaid the remainder of the $77,000 loan.

The second part of the loan, an $80,000 distribution to Louis as indicated by the last phrase of the handwritten note purportedly prepared by George, is also supported by the documentary evidence. On June 13, 2008, George withdrew $80,000 from a certificate of deposit account. In total, Louis and Kathleen, or through Bineshii, obtained $137,500 from George as a result of these apparent loan transactions.

On December 11, 2008, less than one month before George died, he signed a Statutory Short Form Power of Attorney naming Louis as his attorney-in-fact.[5] George authorized Louis to act for him in all matters, by checking option "N" of the form:

*To act for me in any way I myself could act with respect to the following matters,*

---

**5.** Disturbing allegations were raised about how the power of attorney form came to be prepared, presented to George, and executed.

However, the claims were not reliably supported by evidence.

*as each of them is defined in Minnesota Statutes, Section 523.24:*

*(A) real property transactions . . .;*

*(B) tangible personal property transactions;*

*(C) bond, share, and commodity transactions;*

*(D) banking transactions;*

*(E) business operating transactions;*

*(F) insurance transactions;*

*(G) beneficiary transactions;*

*(H) gift transactions;*

*(I) fiduciary transactions;*

*(J) claims and litigation;*

*(K) family maintenance;*

*(L) benefits from military service;*

*(M) records, reports, and statements;*

*(N) all of the powers listed in (A) through (M) above and all other matters.*

*This power of attorney shall continue to be effective if I become incapacitated or incompetent.*

*This power of attorney authorizes the attorney-in-fact to transfer my property to the attorney-in-fact.*

After this time, George generally did not go to his bank; Louis made George's deposits for him. Louis acknowledges that the purpose of the grant of power of attorney was a matter of convenience for George, not a matter of substance.

On January 3, 2009, George was admitted to the hospital. He died at 1:00 a.m. on January 7, 2009. Between the time he entered the hospital and the time he passed away, medical records repeatedly indicate that George was non-conversant, confused, agitated, unable to answer questions, nonresponsive, lethargic, more or less confused, confused and yelling, and finally unarousable.[6]

Myron visited George in the hospital first on the day after he had been admitted and then on the evening before he died. He recalled that at first George was alert and wanted to go home, but confused and a little out of it. When Myron visited George the night before he died, the nurse told Myron that George had been unconscious for all or most of that day.

Louis visited George in the hospital, but only briefly because he was busy adding himself to George's bank accounts, purportedly pursuant to George's wishes expressed to Louis while they waited together in the emergency room. Geraldine Nyberg, Louis's mother, corroborated this story, but her testimony was clearly coached and, if not rehearsed, stated with overly eager sincerity. Indeed, she expressed moments of her own confusion at the trial during her testimony, but when she described George's purported deathbed bequeath to Louis, she seemed as certain that George was lucid and giving clear instructions about his financial accounts as the medical records were certain that George was confused and quiet during the same period of time.[7]

On January 4, 2009, the day after Louis took George to the hospital, Louis added

---

6. George's medical record also documents that Louis represented to the hospital staff that he, Louis, was a doctor, a medical internist specialist, and that he was George's living will trustee.

7. Similarly, Louis's wife Kathleen also insists that George, Geraldine, Louis and she were one big happy family, and moreover that during his hospital stay days before his death, George was entirely lucid and repeatedly insisted that Louis change the accounts because he wanted his money to go to them—to Louis, Kathleen and Geraldine. The Court finds that Geraldine is in denial and under the manipulation and control of Louis. Kathleen may be in a similar position, or she may simply be self-interested. Both Kathleen and Geraldine were not credible witnesses.

his own name as joint owner on two bank accounts, hereinafter "the joint accounts," that had been previously held in the name of George Nyberg, POD [payable on death] Louis Nyberg, Sr.

On January 6, 2009, while George was hospitalized, Louis transferred $114,141.80 from George Nyberg Trust accounts into the joint accounts to which he had added himself as joint owner.

On January 7, 2009, after George had died, Louis made two $50,000 transfers from the joint accounts to an account he held solely in his own name. On the same day, Louis wrote a check to himself for $50,000 from one of the joint accounts, and deposited it into a Western Bank account in the name of Kathleen M. Lausche.

On January 8, 2009, Louis made an on-line transfer of $4,000 from one joint account to the other. On the same day, he also wrote a check to himself in the amount of $75,000 out of one of the joint accounts and deposited it into an account in the name of Kathleen M. Lausche.

On February 6, 2009, Louis withdrew the remaining $1,175.57 and $348.82 from the joint accounts. In total, Louis made transfers of $226,524.39 from the joint accounts to himself and to Kathleen Lausche.

When Tim came to town for George's funeral, Louis claimed to have no funds to assist with the expenses, in spite of recently transferring more than $200,000 to himself from George's accounts. Louis did not disclose the transfers to Tim even once he knew that Tim was the personal representative of George's estate and trustee of George's trust. Tim discovered the transfers when he was collecting George's accounts and the banker told him that George had other accounts at the bank but that he could not discuss them with Tim, which tip caused Tim to pursue an accounting.

Louis was not named as a beneficiary in George's pour-over will and trust. The transfers Louis made out of the joint accounts were contrary to the wishes of George Nyberg, as expressed in his will and trust, which provided that the beneficiaries named therein would receive those funds upon his death.

Plaintiff claims that the actions Louis Nyberg, Jr., took in accessing George Nyberg's accounts and transferring funds to or for his own and his wife's benefit constitute willful and malicious injury for purposes of the § 523(a)(6) exception to discharge. Louis claims he was acting according to George's wishes.

### DISCUSSION

Section 523(a)(6) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

*See* 11 U.S.C. § 523(a)(6).

"To establish that a debt is nondischargeable consistent with this exception, the party seeking to prevent discharge must show by a preponderance of the evidence that the debt is for both 'willful . . . injury' and 'malicious injury.'" *See In re Patch,* 526 F.3d 1176, 1180 (8th Cir.2008), citing *Fischer v. Scarborough (In re Scarborough),* 171 F.3d 638, 641 (8th Cir.1999) ("Willful and malicious are two distinct requirements. . . ."), cert. denied, 528 U.S. 931, 120 S.Ct. 330, 145 L.Ed.2d 258 (1999).

"The meaning of 'willful' under § 523(a)(6) is controlled by the Supreme Court's decision in *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)." *Patch,* 526 F.3d at 1180. "The Court resolved a circuit split over the

meaning of 'willful,' holding that 'debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6).' " *Id.*, citing *Kawaauhau v. Geiger*, 523 U.S. at 64, 118 S.Ct. 974. "Because the word 'willful' in § 523(a)(6) modifies the word 'injury,' the Court concluded that 'nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury.' " *Id.*, citing *Kawaauhau v. Geiger*, 523 U.S. at 61, 118 S.Ct. 974.

"The scope of 'willful . . . injury' under § 523(a)(6), however, is not limited to circumstances in which the debtor desires to bring about the consequences of his conduct." *Patch*, 526 F.3d at 1180. "If the debtor knows that the consequences are certain, or substantially certain, to result from his conduct, the debtor is treated as if he had, in fact, desired to produce those consequences." *Id.*, citing *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 852 (8th Cir.1997) (en banc) (citing the Restatement (Second) of Torts § 8A, cmt. a (1965)), aff'd, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). "[I]n this circuit the 'willful' element is a subjective one, requiring proof that the debtor desired to bring about the injury or was, in fact, substantially certain that his conduct would result in the injury that occurred." *Patch*, 526 F.3d at 1180–1181, citing *Geiger*, 113 F.3d at 852–54.

"To qualify as 'malicious,' the debtor's actions must be 'targeted at the creditor . . . at least in the sense that the conduct is certain or almost certain to cause financial harm.' " *See In re Mad-sen*, 195 F.3d 988, 989 (8th Cir.1999) citing *In re Long*, 774 F.2d 875, 881 (8th Cir. 1985). "[T]he malice standard does not require spite, ill will, or a personal animosity." *See In re Fors*, 259 B.R. 131, 137 (8th Cir. BAP 2001), citing *Erickson v. Roehrich (In re Roehrich)*, 169 B.R. 941, 945 (Bankr.D.N.D.1994). "A wrongful act is malicious if . . . there exists a 'knowing wrongfulness or knowing disregard of the rights of another.' " *Id.* "An act may be found to be malicious even in the absence of a specific, subjective intent to injure." *Id.*

The determination in this case is not difficult. First, the record does not support or even suggest, with minimum essential specificity, any involvement by Kathleen Lausche in the acts complained. There are, of course, obvious implications about her role, and inferences that could be drawn, but not with a sustainable level of certainty. It is not enough that she participated as a result of her marriage, or passively by her presence at the relevant times and in the relevant situations. Accordingly, the complaint against her must be dismissed, and the plaintiff having had the opportunity to develop and litigate his cause against her, dismissed with prejudice.

The question is equally straightforward with respect to Louis Nyberg, Jr. Even if his use of the power of attorney to add himself to George's bank accounts and transfer funds out of George's trust account did not constitute a number of state statutory violations,[8] the

---

8. While a power of attorney cannot generally form the basis for a claim under 11 U.S.C. § 523(a)(4), violation of the statutory provisions controlling power of attorney in Minnesota may arise under § 523(a)(6), and in this case it does appear that certain power of attorney restrictions were not abided. *See* *e.g.*, Minn.Stat. 523.24 Subd. 4 Banking Transactions: In a statutory short form power of attorney, the language conferring general authority with respect to banking transactions, means that the principal authorizes the attorney-in-fact (2) to open in the name of the principal alone, or in a way that clearly evi-

conduct nevertheless amounts to a willful and malicious injury for purposes of § 523(a)(6). During the three days prior to George's death, while George was physically ill and incapacitated in the hospital, while he was confused and agitated, Louis took $226,524.39 from George. He then hid those actions from George's trust and estate, and he claims to have no idea what happened to those funds.

Louis took immediate action not because George suddenly decided that he wanted to leave some of his money to Louis, but because George no doubt appeared to be dying and there was a narrow window of time in which Louis could use the power of attorney to take and conceal all funds he knew of and could reach quickly and easily.

If George had wanted to provide for Louis financially, he could have changed his will and trust. Indeed, Louis admitted (in furtherance of his claim that George wanted to change his will) that George had been supplied with an estate planning questionnaire (by the same attorney office out of which the power of attorney form originated). But, George elected not to complete the questionnaire and not to modify his will or trust.

With respect to the proceeds diverted to Louis, or for his benefit or the benefit of his interests, after George was hospitalized on January 3, 2009, the record demonstrates clearly by an overwhelming preponderance of the evidence that Louis Jr. intended to steal or convert as much of George's cash assets as he could quickly and easily reach. He knew exactly what he was doing and moreover took steps to conceal his actions. He knew that he would be reducing George's trust and estate by as much as he took from it, and he knew that the proper beneficiaries and heirs of George's trust and estate would be harmed in kind. And, Louis knew that he was not a beneficiary or heir of George's trust and estate. All of the elements of § 523(a)(6) are satisfied with respect to the $226,524.39 removed from George's accounts within days of his death.

■ With respect to the funds loaned by George to Louis Jr. (and/or to Kathleen Lausche and/or the business operated by them known as Bineshii) in the unpaid balance amount of $137,500, the Court is not persuaded that the requisite preponderance has been met for purposes of § 523(a)(6). There is no dispute that the funds involved in this transaction constituted a loan. The question is whether George was coerced as a result of his vulnerability and Louis's dominion over George such that the loan in actuality con-

---

dences the principal and attorney-in-fact relationship, a deposit account of any type with any bank; Subd. 8 Gift Transactions: In the statutory short form power of attorney, the language conferring general authority with respect to gift transactions, means that the principal authorizes the attorney-in-fact (2) to make gifts on behalf of the principal to the principal's spouse, children, and other descendants or the spouse of any child or other descendant, and, if authorized by the principal in part Third, to the attorney-in-fact, either outright or in trust, for purposes which the attorney-in-fact deems to be in the best interest of the principal, specifically including minimization of income, estate, inheritance, or gift taxes, provided that, notwithstanding that the principal in part Third may have authorized the attorney-in-fact to transfer the principal's property to the attorney-in-fact, no attorney-in-fact nor anyone the attorney-in-fact has a legal obligation to support may be the recipient of any gifts in any one calendar year which, in the aggregate, exceed $10,000 in value to each recipient. Louis Jr.'s violation of these provisions constitutes, under all of the circumstances of this particular case, an abuse of his POA authority and willful and malicious injury for purposes of 523(a)(6) nondischargeability under federal bankruptcy law.

stituted a willful and malicious taking by way of undue influence.

The first part of the loan, the $77,000, was made approximately a year prior to Louis Sr.'s death. During this time, George was still enjoying the fellowship of his brother in the household. He was not in the position of being alone and relying exclusively upon Louis and Kathleen for his care and well-being. He was by all accounts well and happy at that time.

The second part of the loan ($80,000) was made in June 2008, shortly after Louis Sr. had died. A theory of vulnerability and manipulation would be more plausible at this point, but there are two glaring problems diminishing the argument. First, there is little other than George's expressions of unhappiness to support that he was enduring coercive conditions under the care of Louis and Kathleen. He declined Tim's offer to bring him back to Chicago.

Second, all accounts of George indicate that he was sharp minded and fiercely independent; it would be unlikely for him to capitulate easily under pressure. He did not, for example, agree to modify his will or trust and never even completed the questionnaire provided to him for that purpose. If George had felt threatened, all characterizations of him suggest that he would have picked up a phone at the earliest opportunity and obtained assistance. That is not to say he was not unhappy, but merely to suggest that he was apparently a steadfast and resourceful sort of person.

It makes sense, therefore, that Louis's first opportunity to take advantage of George to the extent of seizing all of his on-hand cash assets was not until George was physically and mentally incapacitated. Accordingly, the Court cannot conclude that George did not freely make the loans, and there is no basis for nondischargeability of unpaid loan proceeds apparently willingly disbursed by George during his lifetime.

## DISPOSITION

IT IS HEREBY ORDERED:

1. The debt owing to Timothy Guzick, as Personal Representative of the Estate of George J. Nyberg and as Trustee of the George J. Nyberg Trust, from debtor-defendant Louis K. Nyberg, in the approximate amount of $226,524.39, is nondischargeable pursuant to 11 U.S.C. § 523(a)(6), and excepted from the Louis K. Nyberg's general discharge in main case BKY10–61146;

2. Pursuant to the Order granting summary judgment (docket entry 16 in this proceeding, entered on June 1, 2011), the debts described here are not excepted from the general discharge as a result of 11 U.S.C. § 523(a)(4); and

3. The complaint is dismissed with prejudice only with respect to debtor-defendant Kathleen M. Lausche, and plaintiff shall have judgment and recover only against debtor-defendant Louis K. Nyberg.

LET JUDGMENT BE ENTERED ACCORDINGLY.