# United States Court of Appeals

## For the Eighth Circuit

_____

No. 17-1261

_____

In re: Michael P. Harris, As surety for Faribault Mills Inc., As surety for Faribault Woolen Mill Company

*Debtor*

------------------------------

U.S. Department of Labor

*Appellee*

v.

Michael P. Harris

*Appellant*

_____

Appeal from the United States Bankruptcy
Appellate Panel for the Eighth Circuit

_____

Submitted: February 15, 2018
Filed: August 3, 2018

_____

Before SMITH, Chief Judge, MURPHY and COLLOTON, Circuit Judges.[*]

_____

_____

[*]This opinion is filed by Chief Judge Smith and Judge Colloton under Eighth
Circuit Rule 47E.

SMITH, Chief Judge.

The United States Department of Labor (DOL) obtained a pre-bankruptcy judgment against debtor Michael Harris in federal district court. The judgment provided that, under the Employee Retirement Income Security Act of 1974 (ERISA), Harris breached his fiduciary duty when the company he managed as the chief executive officer (CEO) failed to remit funds withheld from its employees' paychecks for their health insurance plan. The DOL filed an adversary proceeding in Harris's Chapter 7 bankruptcy to have that judgment debt declared nondischargeable as a debt for defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4). The bankruptcy court granted summary judgment in the DOL's favor, declaring the debt nondischargeable.

The Eighth Circuit Bankruptcy Appellate Panel (BAP) affirmed the bankruptcy court's grant of summary judgment in the DOL's favor. Harris appeals, arguing that he (1) was not acting in a fiduciary capacity under § 523(a)(4) when the alleged defalcation occurred, and (2) did not act with the intent required for defalcation under § 523(a)(4). We affirm.

## I. *Background*[1]

### A. *Healthcare Plan*

In 2001, Harris became CEO, President, and Chairman of the Board of Directors of Faribault Woolen Mills Company ("Faribault"), a blanket manufacturer. He owned 0.3 percent or less of Faribault's outstanding stock and had common options.

Faribault sponsored the Faribault Woolen Mills, Inc. Fully Insured Hospital Life Welfare Plan ("Plan") to provide health insurance for its employees. The Plan contracted with HealthPartners Health Insurance Company ("HealthPartners") to provide healthcare benefits for Plan participants. Employee contributions funded 100 percent of the health insurance premiums. The premiums were due to HealthPartners on the first of every month to provide insurance coverage for that month. Faribault withheld the health insurance premiums from the employee-participants' paychecks and then remitted the amount owed to HealthPartners from its general operations account on the first of each month. (Faribault also paid its general corporate expenditures from the same general operations account.) Harris knew that the payments were due monthly.

Gary Glienke, Faribault's Vice President of Human Resources, was responsible for receiving and rectifying the bills from HealthPartners for the health insurance premiums. He then sent the bills to Carla Craig, Faribault's Accounts Payable Administrator. From January 2008 to April 1, 2009, Harris, Glienke, and Faribault

---

[1]The parties filed a "Statement of Uncontested Facts" with the bankruptcy court. *See* Defendant's Notice of Hearing and Motion for Summary Judgment, Exhibit 2, *U.S. Dep't of Labor v. Harris*, No. 16-04019 (Bankr. D. Minn. June 30, 2016), ECF No. 11. These facts are nearly identical to the district court's findings in the ERISA case. *See Perez v. Harris*, No. 12-CV-3136 (SRN/FLN), 2015 WL 6872453, *1–8 (D. Minn. Nov. 9, 2015).

Chief Financial Officer (CFO) Carmen Dorr all had signatory authority on the general operating account, payroll account, and other Faribault accounts.

In 2008, HealthPartners notified Faribault via letter that the health insurance premiums were past due for January, February, March, April, May, June, August, September, October, and December. When Glienke received these letters, he alerted Harris that the premiums were past due and had to be paid. Harris then usually asked Glienke to see if he could obtain an extension on payment.

On at least two occasions in 2008—January 29 and November 26—Faribault issued checks to HealthPartners that Harris had signed that were subsequently returned by Faribault's bank to HealthPartners due to insufficient funds. Following the return of those checks, Faribault ultimately remitted payment of the insurance premiums to HealthPartners without loss of Plan insurance coverage.

Faribault issued a check on January 27, 2009, signed by Harris, to HealthPartners for $22,593.02 to pay Plan premiums owed for January 2009. That check also bounced. In a letter dated February 28, 2009, HealthPartners informed Glienke that the January check had bounced and that it would cancel the Plan if Faribault did not pay in full. That same day, HealthPartners also sent letters to the Plan participants, informing them that Faribault did not pay in full. As a Plan participant himself, Harris received that letter. Glienke also testified that when he received letters like the February 28 letter, he would inform Harris of it.

Meanwhile, on February 27, 2009, Faribault issued a check that Harris signed to HealthPartners for $19,466.91 to pay the February 2009 Plan premiums. HealthPartners returned the February 27 check to Faribault. In an accompanying letter dated March 3, 2009, HealthPartners informed Dorr, Faribault's CFO, that it would accept only wire payments due to Faribault's prior insufficient-funds checks.

On March 26, 2009, Harris contacted HealthPartners and requested a payment extension of the Plan premiums for January and February 2009. HealthPartners denied the request and demanded payment of the full two months' worth of premiums by March 31, 2009. When Faribault did not remit the overdue payments, HealthPartners canceled the Plan's insurance policy on April 1, 2009, retroactive to January 31, 2009, due to non-payment of premiums. Faribault thus never remitted $55,040.61 withheld from its employees' paychecks for insurance premiums from January 9, 2009, to March 20, 2009. Forty-two employees (and some of their families) were affected by the Plan's cancellation.

Also from January to March 2009, Faribault issued checks to other creditors from the general operations account containing commingled Plan premiums. For instance, between March 26 and March 31, 2009, over $70,000 was either transferred to Faribault accounts or was used to pay creditors and expenses. This amount includes several payments that were made to Harris's personal accounts, such as (1) a March 27, 2009 wire transfer for $1,500 made from Faribault's general operations account to Harris and his wife's account; (2) a March 30, 2009 payment of $4,000 made at Harris's direction from Faribault's general operations account to Harris's American Express account; and (3) a March 31, 2009 payment of $21,531.48 made from Faribault's general operations account on Harris's home equity line of credit. Importantly, Harris asked Dorr to make the March 31 payment despite having been informed by Dorr that Faribault could not make the full HealthPartners Plan premium payment that was due.

Harris lost control of Faribault's finances sometime after March 2009, and he resigned as CEO in May 2009. Faribault was later liquidated.

B. *District Court Proceedings*

On December 12, 2012, the DOL filed a complaint against Harris in federal district court, alleging that he violated ERISA. Specifically, the DOL asserted Harris failed to remit the $55,040.61 in withheld employee earnings to pay for the Plan's healthcare premiums to HealthPartners. The DOL alleged that Harris's failure to use the employees' withheld wages to pay the HealthPartners premium breached his duty of loyalty to the Plan participants, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

Following a bench trial, the district court held that Harris breached his fiduciary duty of loyalty under ERISA. The court found that Harris diverted $55,040.61 in employee contributions intended for insurance premiums to pay corporate expenses and his own home-equity loan. The district court first determined that Harris acted as an ERISA fiduciary. Harris served in a fiduciary capacity in the handling of his employees' withheld—but unremitted—contributions to the Plan to pay Plan premiums. According to the court, the amounts withheld from Faribault employees' paychecks for Plan premium payments became "'plan assets,' and they became so as of the date on which the employees' wages were paid (i.e., the date on which the employees' contributions were withheld)." *Perez*, 2015 WL 6872453, at *10. The court also found "that Harris exercised authority or control respecting the management or disposition of those plan assets." *Id.* As an example, the district court cited Dorr's testimony "that she did not have the authority, without Harris's approval, to remit employee contributions to HealthPartners. Indeed, the checks to HealthPartners were signed by Harris." *Id.* Additionally, the court noted that "when Glienke brought HealthPartners's past-due notices to Harris's attention, Harris asked Glienke to try to get an extension—or, in March 2009—called HealthPartners himself to request an extension." *Id.* The court concluded "that Harris was a fiduciary to the Health Plan from at least January 1, 2009[,] to March 31, 2009," because he exercised authority and control over plan assets during that time. *Id.* at *11.

Second, the district court found "that Harris breached his duty of loyalty to the Health Plan by failing to remit plan assets to the Health Plan and instead using those assets to pay corporate creditors and personal expenses." *Id.* at *12. Specifically, the court determined that Harris breached his duty of loyalty "when, in late March 2009—after he claims he first learned that the January and February premiums had not been remitted to HealthPartners—he directed or allowed funds from [the general operations account] to be used to pay Faribault Mills's expenses and debts instead of the HealthPartners premiums." *Id.*

The district court determined that Harris's fiduciary breach caused the $55,040.61 in losses that the Plan suffered. The court characterized the evidence as showing "that an amount of money significantly higher than the amount of premiums that was due to HealthPartners was removed from the account from which premiums were paid and was neither paid to HealthPartners nor returned to the employees, but instead was used to pay other corporate expenses or debts." *Id.* The district court found Harris liable to the Plan for $55,040.61 in restitution and, with prejudgment interest, awarded a total of $67,839.60. Harris did not appeal.

C. *Bankruptcy Proceedings*
1. *Bankruptcy Court*

On November 23, 2015, Harris filed a Chapter 7 bankruptcy petition. Harris listed the DOL as an unsecured, nonpriority creditor for the $67,839.60 that he owed under the district court's judgment. On February 29, 2016, the DOL filed an adversary proceeding in Harris's Chapter 7 bankruptcy to have the judgment debt declared nondischargeable. The DOL wanted Harris's debt to be considered the result of defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4).

-7-

The DOL moved for summary judgment, arguing that (1) the collateral-estoppel doctrine gave preclusive effect in the bankruptcy case to the district court's factual and legal determinations, and (2) Harris's debt was nondischargeable because it arose from "defalcation while acting in a fiduciary capacity" based on those factual and legal determinations. *See* 11 U.S.C. § 523(a)(4). The parties stipulated to 62 uncontested facts identified in the district court's opinion as its "Findings of Fact." *See* Defendant's Notice of Hearing and Motion for Summary Judgment, Exhibit 2; *see also Perez*, 2015 WL 6872453, at *1–8.

The bankruptcy court granted summary judgment in the DOL's favor, declaring the debt nondischargeable. First, the court agreed that collateral estoppel applied to the case and accepted the district court's legal conclusions and factual findings. The court then addressed whether Harris's actions constituted defalcation within a fiduciary relationship under § 523(a)(4). It held that Harris acted as a § 523(a)(4) fiduciary with respect to the Plan premiums withheld from employee paychecks. The court recognized that, under ERISA, employee contributions become plan assets when they are withheld from employee paychecks. Harris exercised control over employee contributions to the Plan held in Faribault's general account. These contributions were plan assets. Harris's actions made him a fiduciary with obligations under ERISA to protect the Plan's assets in that account and to prevent their misuse.

The bankruptcy court also found that Harris's control over withheld employee contributions began prior to his decision to divert those employee contributions to pay corporate expenses in late March 2009. Thus, Harris had a fiduciary obligation to protect the Plan's assets. His decision to violate his fiduciary duties and divert those assets to pay for his own expenses and Faribault's corporate expenses was the basis of the ERISA judgment.

-8-

Finally, the bankruptcy court applied *Bullock v. BankChampaign N.A.*, 569 U.S. 267 (2013), and determined that Harris had committed defalcation under § 523(a)(4). According to the court, "several undisputed facts suggest that [Harris] was willfully blind to a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty, thereby qualif[ying] his conduct as defalcation under section 523(a)(4)." J.A. at 714. Those facts included that Harris "had the authority over the Faribault Mills' checking and corporate bank accounts, that he signed checks, that he was instructed not to use checks unless funds were available to cover the checks. He signed checks that were returned because of insufficient funds." *Id.* at 714–15. Harris ultimately decided to pay himself, Faribault, and other creditors instead of remitting to HealthPartners his employees' healthcare premiums withheld from the employees' own paychecks. The bankruptcy court concluded that "Harris exhibited a reckless and conscious disregard of [the fiduciary relationship] sufficient to meet the *Bullock* standard and that he violated a duty of undivided loyalty to the plan payments." *Id.* at 718.

The bankruptcy court thus held that Harris's ERISA judgment debt was nondischargeable under § 523(a)(4).

## 2. *BAP*

Harris appealed the bankruptcy court's decision to the BAP, and the BAP affirmed the bankruptcy court's holding that Harris committed defalcation while acting in a fiduciary capacity and that his ERISA judgment debt was consequently nondischargeable under § 523(a)(4).

The BAP first determined that the money withheld from the employees' paychecks constituted a trust *res* because "Faribault was holding funds that actually belonged to someone else . . . and it had a duty to use the employees' money to make the premium payments." *In re Harris*, 561 B.R. 726, 734 (B.A.P. 8th Cir. 2017). The

BAP opined that whether a trust *res* is created depends "on whether the funds to be contributed have been withheld from employee wages, or are simply a debt of the company." *Id.* Consistent with this distinction, the BAP held that "this case fits squarely with those cases holding that a trust is created when the employer withholds wages for payments to a plan providing benefits to employees." *Id.*

Second, the BAP determined that Harris was a fiduciary under § 523(a)(4). In making this determination, the BAP cited Harris's concession "that, as CEO, he had the ultimate authority as to which bills to pay" and the district court's finding that Harris's "authority existed throughout the period in which funds withheld from wages were not remitted to HealthPartners." *Id.* at 735. The BAP applied collateral estoppel to the district court findings. It concluded that the prior ERISA action litigated the same issue of Harris's authority and control resulting in a valid judgment. *Id.* As a result, the BAP determined that the DOL established that Harris (1) "chose to pay other bills, rather than the premiums necessary to maintain health insurance coverage for the employees"; (2) "had ultimate responsibility to determine which bills would be paid out of the company's scarce resources"; and (3) exercised his authority to determine which bills to pay to his own benefit. *Id.* The BAP therefore held that the bankruptcy court correctly concluded that Harris "had fiduciary responsibilities with respect to funds that had been withheld from wages for payment to HealthPartners." *Id.*

Finally, the BAP determined that Harris committed defalcation as to the Plan funds based on the undisputed facts. Specifically, the BAP concluded that Harris acted either intentionally or with gross recklessness under § 523(a)(4). The BAP explained that "[b]etween March 26 and 31, [Harris] knew that more than $55,000 of the funds in Faribault's operating accounts were withheld from employee wages and did not belong to the company—yet, [Harris] chose to use those funds to pay personal and corporate expenses." *Id.* at 737. "Based on the undisputed facts, and based on

[Harris's] failure to offer a justifiable reason for his decision not to use the remaining funds for the benefit of the employees for whom they were held in trust," the BAP held that "the Bankruptcy Court properly concluded that there was no genuine issue of material fact as to his intent, and that DOL was entitled to judgment as a matter of law." *Id.* at 738.

## II. *Discussion*

"Like the BAP, we review the bankruptcy court's entry of summary judgment *de novo*." *In re Patch*, 526 F.3d 1176, 1179 (8th Cir. 2008) (citation omitted).

"Section 523(a) defines classes of debts that are excepted from a Chapter 7 debtor's discharge in bankruptcy." *In re Thompson*, 686 F.3d 940, 944 (8th Cir. 2012). Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." To prevent a debtor's discharge under § 523(a)(4), the objecting party must "establish the following two elements: (1) that a fiduciary relationship existed between [the debtor] and [the objecting party]; and (2) that [the debtor] committed fraud or defalcation in the course of that fiduciary relationship." *In re Shahrokhi*, 266 B.R. 702, 707 (B.A.P. 8th Cir. 2001) (citations omitted). "We construe these exceptions narrowly, imposing the burden of proof on the creditor opposing discharge." *In re Thompson*, 686 F.3d at 944 (citation omitted).

On appeal, Harris argues that, based on the undisputed facts, he was not acting in a fiduciary capacity under § 523(a)(4) when the alleged defalcation occurred. He also argues that he did not act with the intent required for defalcation under § 523(a)(4).

-11-

## A. *Fiduciary Capacity*

Harris contends the bankruptcy court should not have applied collateral estoppel to the district court's finding that he acted as an ERISA fiduciary. Harris asserts that the district court decided a different issue than the issue presented in the bankruptcy proceeding. The district court found that a trust *res* came into being and that an ERISA fiduciary relationship was formed when the funds were withheld from employees' paychecks. Harris contends that the district court determined that his fiduciary status under ERISA *did not* depend on whether he personally exercised control over the Plan assets. According to Harris, Faribault, as the Plan administrator, was an ERISA fiduciary, not Harris. Harris, as Faribault CEO, had authority over Plan payments, but Faribault's CFO regularly made the payments, not Harris.

"Whether a relationship is a 'fiduciary' one within the meaning of § 523(a)(4) is a question of federal law." *In re Thompson*, 686 F.3d at 944 (quoting *In re Nail*, 680 F.3d 1036, 1039 (8th Cir. 2012)). "We have interpreted the term 'fiduciary' in § 523(a)(4) to refer only to trustees of 'express trusts.'" *Hunter v. Philpott*, 373 F.3d 873, 875 (8th Cir. 2004) (quoting *In re Long*, 774 F.2d 875, 878 (8th Cir. 1985)). The statute "uses the term fiduciary 'in a "strict and narrow sense," and therefore does not embrace trustees of constructive trusts imposed by law because of the trustee's malfeasance.'" *In re Thompson*, 686 F.3d at 944 (quoting *Hunter*, 373 F.3d at 876). Section 523(a)(4) "speaks of technical trusts, and not those which the law implies from the contract." *Id.* (quoting *In re Nail*, 680 F.3d at 1039). "It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto." *Id.* (quoting *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934)). A state statute, the common law, or a contract creating a trust may satisfy § 523(a)(4). *Id.*

We have rejected "the simple determination tha[t] an individual is an ERISA fiduciary is enough to satisfy the requirements of § 523(a)(4)." *Hunter*, 373 F.3d at 875. Rather, "we look specifically at the property that is alleged to have been defalcated to determine whether [the debtor] was legally obligated to hold [the] specific property for the benefit of [the employee benefit funds]." *Id.*

In *Hunter*, company owners entered into a collective bargaining agreement (CBA) with a union. *Id*. at 874. The CBA required the company to contribute to employee benefit funds and to pay contributions to the fund once per month. *Id*. The company held the money in its general account. *Id*. at 875. The company missed two months of contributions. *Id*. In addition, cash withdrawals were made from the company's general account, and the company owners issued checks to themselves from that same account in excess of $24,500. *Id.* The employee benefit funds brought suit under ERISA and sought a judgment in the amount of the unpaid contributions. *Id.* The bankruptcy court found that the amount of unpaid contributions totaled $84,471.67. *Id.* One of the company owners then filed for bankruptcy protection, and the employee benefit funds brought an adversary proceeding against him under § 523(a)(4) for defalcation of the funds' property while serving in a fiduciary capacity. *Id.* The bankruptcy court's holding was that the unpaid contributions were property of the employee benefit funds, the debtor was an ERISA fiduciary acting in his fiduciary capacity, and the debtor "committed defalcation in breach of his fiduciary duty by failing to hold all available assets for the purpose of satisfying [the company's] obligations to the Funds." *Id.*

On appeal, we reversed after examining the property and determining that the debtor was not legally obligated to hold it for the employee benefit funds' benefit. First, we noted that "[t]he CBA did not include a provision that explicitly required [the company] to hold income earned as a result of the union member's labor in trust for the satisfaction of liabilities owed to the Funds." *Id.* at 876. As a result, the debtor

-13-

was "not legally obligated to hold any particular property for the benefit of the Funds." *Id*. No evidence existed that any of the money deposited into the company's account during the relevant time period "was generated by union members." *Id*. As a result, we explained that "[s]imply possessing property to which an ERISA plan asserts a claim does not place one in a fiduciary relationship with the plan." *Id*. (citation omitted).

Second, we examined the substance of the transaction to conclude that the debtor's relationship with the employee benefit funds "was basically contractual, not fiduciary, in nature." *Id*. at 877 (citation omitted). This was because the debtor "was not personally a party to the CBA" and therefore could not "have expressly assumed the status of trustee of any trust arising from that document." *Id*. at 876 (citation omitted).

Finally, we concluded that the debtor's fiduciary relationship did not preexist the debt. *Id*. at 877. "In the § 523(a)(4) context, the fiduciary relationship must preexist 'the incident creating the contested debt and apart from it. It is not enough that the trust relationship spring from the act from which the debt arose.'" *Id*. (quoting *In re Dloogoff*, 600 F.2d 166, 168 (8th Cir. 1979)). In *Hunter*, the debtor's debt to the employee benefit funds failed to preexist "his failure to hold money to satisfy [the company's] owed contributions." *Id*. This was because "[a]ny possible trust relationship between [the debtor] and the Funds could only have come into existence when he incurred some individual financial liability to the Funds." *Id*. We determined that the debtor's "personal liability arose at the time of [the company's] failure to satisfy its obligations. Only then did he owe a duty to the Funds. The only possible trust relationship therefore would have sprung from the wrongful act that created the financial liability." *Id*.

-14-

Here, Harris does not challenge the district court's factual findings that (1) "a plan asset was created once employee funds were withheld for insurance payments on January 9, 2009, and that, since [Harris] had authority regarding those assets, he was an ERISA fiduciary," and (2) Harris "exercised authority over the plan assets in March of 2009." Appellant's Br. at 12. Instead, he argues that, applying *Hunter*, these factual findings are not dispositive of his status as a fiduciary under § 523(a)(4).

But *Hunter* is distinguishable. It falls into the category of "cases involving debts for employer contributions . . . where courts found no fiduciary status under § 523(a)(4)." *In re Pottebaum*, No. ADV 11-9050, 2013 WL 5592368, at *5 (Bankr. N.D. Iowa Oct. 9, 2013) (citing *In re Gott*, 387 B.R. 17, 23–24 (Bankr. N.D. Iowa 2008) (citing *Hunter,* 373 F.3d at 875; *In re Bucci*, 493 F.3d 635, 641–42 (6th Cir. 2007); *In re Luna*, 406 F.3d 1192, 1208 (10th Cir. 2005); *In re Halpin*, 370 B.R. 45, 50 (N.D.N.Y. 2007); *In re Popovich*, 359 B.R. 799, 806 (Bankr. D. Colo. 2006); *In re Tsikouris*, 340 B.R. 604, 617 (Bankr. N.D. Ind. 2006); *In re Engleman*, 271 B.R. 366, 370 (Bankr. W.D. Mo. 2001))). This case falls into the category of "cases involving employee contributions or amounts actually withheld from employee paychecks—where courts found the employers were fiduciaries under § 523(a)(4)." *Id.* (citing *In re Gott*, 387 B.R. at 24 (citing *Eavenson v. Ramey*, 243 B.R. 160, 166 (N.D. Ga. 1999); *In re Johnson*, No. 05-36068, Adv. No. 05-3583, 2007 WL 646376, at *5 (S.D. Tex. Feb. 26, 2007); *In re O'Quinn*, 374 B.R. 171, 175 (Bankr. M.D.N.C. 2007); *In re Weston*, 307 B.R. 340, 343 (Bankr. D.N.H. 2004); *In re Gunter*, 304 B.R. 458, 462 (Bankr. D. Colo. 2003); *In re Coleman*, 231 B.R. 393, 396 (Bankr. S.D. Ga. 1999))).

The stipulated facts, as well as the unchallenged facts found by the district court, show that Harris exercised control over Plan assets before he diverted any employee contributions; therefore, the fiduciary relationship preexisted the debt. *See Hunter*, 373 F.3d at 877. Harris did not object to the district court's factual finding

that "Harris exercised authority or control respecting the management or disposition of those plan assets" "that were withheld from the Faribault Mills's employees' paychecks between January 9, 2009[,] and March 20, 2009—and neither remitted to HealthPartners nor refunded to the employees." *Perez*, 2015 WL 6872453, at *10. The district court found based on Dorr's testimony "that she did not have the authority, without Harris's approval, to remit employee contributions to HealthPartners." *Id.* And the parties' joint stipulation and the district court's factual findings show that (1) Harris was the signatory on the checks remitted to HealthPartners, (2) Glienke notified Harris of HealthPartners's past-due notices, and (3) Harris called HealthPartners to request an extension. Finally, the district court found that "Harris was personally involved in decisions regarding which creditors were paid" and "was personally involved—and exercised his authority—in the decision not to remit employee withholdings to the Health Plan." *Id.* at 10–11.

Accordingly, we affirm the bankruptcy court's conclusion that Harris had fiduciary obligations regarding the funds that had been withheld from wages for payment to HealthPartners.

## B. *Defalcation*

Harris argues that even if he acted as a fiduciary in March 2009, his conduct was not intentional so as to constitute "defalcation" under § 523(a)(4). He asserts that the stipulated facts show that he acted out of a desperate attempt to save his company and not intentionally or with gross recklessness. In support of his mental state, he cites the following evidence: (1) he personally borrowed over $960,000 from his home equity line of credit to keep the company afloat; (2) he took only one paycheck in the first quarter of 2009; (3) he never sought reimbursement for over $31,000 in expenses, (4) until early March 2009, he believed he had obtained $12.9 million in financing, which would have fully paid all the premiums; and (5) he believed

-16-

sufficient funds were on hand when he signed the checks to HealthPartners that were ultimately returned for insufficient funds.

Defalcation under § 523(a)(4) requires "a culpable state of mind" with a "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock*, 569 U.S. at 269. "[W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, [defalcation] requires an intentional wrong." *Id.* at 273. An intentional wrong includes "not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent." *Id.* at 274. This necessarily includes "reckless conduct of the kind set forth in the Model Penal Code." *Id.* "Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* (quoting Model Penal Code § 2.02(2)(c), at 226 (Am. Law Inst. 1985)). A substantial and unjustifiable risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id*. (quoting Model Penal Code § 2.02(2)(c), at 226).

In its analysis, the BAP relied on *In re Fahey*, 494 B.R. 16 (Bankr. D. Mass. 2013), in support of its conclusion that the undisputed facts supported a finding that Harris committed defalcation. The BAP concluded that Harris violated his duty of loyalty to the Plan by "'decid[ing] not to remit the employee withholdings to HealthPartners,' and 'instead us[ing] those assets to pay corporate creditors and personal expenses,'" as the district court found in the underlying case. *In re Harris,* 561 B.R. at 736 (quoting *Perez*, 2015 WL 6872453, at *12). In *Fahey*, the bankruptcy

court concluded that the debtor had committed defalcation when he violated his duty of loyalty to an ERISA plan, stating:

> Under the Trust Agreements, unpaid contributions that were due and owing were assets of the Funds. The Debtor does not dispute that he was aware of his obligations to the Funds, but nonetheless failed to remit the assets. Instead, the undisputed facts indicate that the Debtor prioritized the payment of corporate expenses that were beneficial to him, such as the Citizens Bank loan which he personally guaranteed and his personal loan to Zani, over his obligations to the Funds. In so doing, he violated the duty of loyalty to the beneficiaries of the Funds. Therefore, I find that the Debtor committed a defalcation within the meaning of 11 U.S.C. § 523(a)(4).

494 B.R. at 23 (footnote omitted).

Like the debtor in *Fahey*, Harris knew he had an obligation to remit the withheld employee contributions to HealthPartners but instead chose to prioritize payments of corporate expenses and creditors, including payments on his own personal line of credit.

Nevertheless, Harris urges us to disregard *Fahey* because the debtor in that case made no attempt to keep the company afloat. He asks us to instead apply *In re Pottebaum*; in that case, the debtor-president of an electrical contractor company, of which he was the sole shareholder, filed for Chapter 7 bankruptcy after his company went out of business. 2013 WL 5592368, at *1. The bankruptcy court credited the debtor's testimony and concluded that he lacked the requisite state of mind to have defalcated the union workers' funds. *Id.* at *6. The facts of *Pottebaum*, however, are distinguishable.

On the issue of defalcation under § 523(a)(4), the *Pottebaum* court found that the debtor lacked the requisite state of mind because the court heard no

> evidence that Debtor's failure to remit payment to Plaintiffs involved "bad faith, moral turpitude, or other immoral conduct." Rather, the Court heard both witnesses paint the picture of a union company and the Union working together to keep the company afloat with the hope and intent of getting everyone paid eventually. Debtor made the payments when he was able. He tried to make good on the plan him and the Union both were pursuing—it simply did not happen. His intent was to make the payments and do right by everyone—not the opposite, which Plaintiffs must show to make the debt nondischargeable.
>
> Without a knowing, intentional, or bad faith action, Plaintiffs must show Debtor's conscious disregard to a substantial and unjustifiable risk that his conduct would violate a fiduciary duty. Plaintiffs made no such showing. The Court heard only that Debtor was desperately attempting to prioritize his bills in order to eventually pay them all. He did so while communicating about his problems with the Union and worked with it to try to fund all his obligations. This is not at all evidence that Debtor acted with a conscious disregard to a substantial and unjustifiable risk that his conduct would violate a fiduciary duty. Plaintiffs have not met their burden of showing Debtor committed a "defalcation" while acting as a fiduciary.

*Id*. (citations omitted).

Harris, unlike the debtor in *Pottebaum*, was not in contact with Faribault's employees about the health insurance premiums; they had no knowledge that Faribault had fallen behind in paying those premiums. Unlike the debtor in *Pottebaum* who prioritized bills in the employees' favor, Harris prioritized bills in his own favor, paying his own line of credit before paying anything toward the health insurance premiums. More specifically, Harris has not disputed the district court's

-19-

factual finding that "he directed Dorr to . . . use the funds available in the checking account from which premiums were paid to make a March 31, 2009 payment on his home equity line of credit" "after speaking with Dorr and determining that Faribault Mills would be unable to pay the full premium due to HealthPartners." *Perez*, 2015 WL 6872453, at \*11. And, as previously discussed, the district court also found that Harris "had ultimate authority during at least the first quarter of 2009 to determine which of Faribault Mills's expenses would be paid." *Id.* at \*10. Instead of preserving the withholdings, Harris misused the Plan's assets for his own and Faribault's purposes. He decided "not to remit the employee withholdings." *Id.* at \*12.

In summary, these undisputed facts and unchallenged factual findings support the conclusion that Harris committed defalcation in late March 2009 when he chose to use plan assets to pay himself and other corporate expenses instead of remitting those assets to HealthPartners.

### III. *Conclusion*

Accordingly, we affirm the judgment of the BAP.

_____