# United States Court of Appeals
### For the Eighth Circuit

_____

No. 19-2751
_____

In re: Derek Francis Luebbert

*Debtor*

------------------------------

Derek Francis Luebbert

*Appellant*

v.

Global Control Systems, Inc.

*Appellee*
_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: September 23, 2020
Filed: February 9, 2021
_____

Before SMITH, Chief Judge, BENTON and KOBES, Circuit Judges.
_____

KOBES, Circuit Judge.

Derek Luebbert sought to discharge hundreds of thousands of dollars in judgment debt in bankruptcy after a breach of contract lawsuit indebted him to his

former employer. He appeals the bankruptcy court's[1] determination that the debt resulted from his infliction of a willful and malicious injury on his former employer and so was non-dischargeable under 11 U.S.C. § 523(a)(6). We conclude the facts underlying Luebbert's breach of contract judgment show that he caused a willful and malicious injury and affirm.

I.

Global Control Systems hired Luebbert as an engineer in 2006. Luebbert signed an employment contract which said if he was fired or resigned he would not solicit business from GCS's customers or compete with GCS within 100 miles for three years. Luebbert's principal responsibility was to develop software for GCS's client, Alliant Techsystems. Luebbert eventually became so essential to one of Alliant's projects that he worked exclusively with Alliant, was named to Alliant's project management team, and spent most of his time working at Alliant's physical location.

Luebbert grew frustrated with his pay. He decided to create his own company, Atlas Industrial Solutions, and bid on Alliant's projects while still working for GCS. Luebbert did not tell GCS about his new business or his Alliant bids. Using information he acquired through his ongoing employment with GCS—and using GCS's own bidding form—Luebbert bid on and won a contract for one of Alliant's projects, PO D95.

The day Luebbert got word that Alliant accepted his PO D95 bid, he sent a letter to his GCS supervisor explaining that he was resigning because he "decided to pursue alternate career opportunities." App. 637. Luebbert did not tell GCS why he was resigning or about his continuing work for Alliant. But GCS got wise to the situation and threatened legal action. After Luebbert did more to harm GCS—

---

[1]The Honorable Cynthia A. Norton, Chief Bankruptcy Judge, United States Bankruptcy Court for the Western District of Missouri.

including stealing information and wiping computer hard drives—GCS and Luebbert settled.

The settlement agreement allowed Luebbert to continue work on Alliant's essential PO D95 project but required him to give GCS most of the proceeds. This arrangement was designed to compensate the parties as if Luebbert still worked for GCS. Luebbert and GCS then coordinated with Alliant to arrange payment: Alliant would issue two-party checks payable to both GCS and Atlas. The checks would be sent first to Luebbert, who would endorse them on his company's behalf, and then he would send them to GCS to be cashed. GCS would then send Luebbert his share.

The PO D95 project was originally expected to last six months. It was later expanded and would ultimately take much longer, so GCS and Luebbert amended their settlement agreement. The amended settlement (1) suspended Luebbert's noncompete for the remainder of the PO D95 project, permitting him to work on Alliant projects only while the PO D95 project was ongoing; (2) provided that the parties would evenly split all payments for any work Luebbert did for Alliant until the PO D95 project was completed; and (3) provided that Alliant would continue to issue two-party checks payable to both GCS and Atlas. The amended settlement also required Luebbert to keep GCS in the loop about additional purchase orders, work requests, invoices, or any other accounting.

This arrangement worked for over a year. But trouble brewed again when Luebbert decided the arrangement was unfair and schemed to keep more money than his settlement with GCS allowed. Luebbert changed his company's invoicing address on file with Alliant to a P.O. Box over 100 miles away from his old address without informing GCS.[2] He started receiving purchase orders from Alliant for new

---

[2]The new address, a P.O. Box in Westphalia, Missouri, was over 100 miles away from both Luebbert's old address in Kansas City and his work for Alliant in neighboring Independence, Missouri. *See* App. 31, 33, 69. Luebbert's noncompete prohibited competing with GCS within 100 miles.

projects and working on them without notifying GCS.  Luebbert kept GCS from learning about his new work by directing Alliant to send invoices solely to him at his new address and to issue those invoices in his company's name only.  When Alliant complied but kept GCS's name on checks made out for the new projects, Luebbert instructed Alliant to remove any reference to GCS because of what he said was a "name change."[3]  App. 645.  He then directed Alliant to void the two-party checks for the new projects and reissue them in Atlas's name.  Luebbert did not tell GCS about any of this, nor did he share any of the proceeds from the new projects or the reissued checks.

The day after Alliant promised Luebbert that it would issue all future checks only to Atlas, Luebbert told GCS that he would no longer abide by the settlement agreement.  Rather than comply with the renewed force of his noncompete, Luebbert continued working on Alliant projects.  Alliant then issued another check to Luebbert including GCS's name.  Luebbert struck out GCS himself, deposited the check, and demanded further assurances from Alliant that his company would be the only recipient of any payment moving forward.  During this time, GCS tried to communicate with Luebbert about complying with the settlement and tried to ask him about missing accounting, but it was unable to make contact with him—in part because he had changed his mailing address to the P.O. Box.

GCS sued Luebbert for breach of contract in Missouri state court.  While the lawsuit was pending, Luebbert told Alliant that he was working for a friend's company and directed Alliant to send all checks to that company instead.  The friend's company remitted those checks to Luebbert, allowing him to retain their full value rather than splitting them with GCS.  Luebbert removed the breach of contract case to federal court by invoking diversity jurisdiction.  The case went to trial and resulted in a jury verdict against Luebbert for $302,631.31 in damages, the money

---

[3]Luebbert never changed his personal name or his company's name after referring to the "name change," and GCS never changed its name.  App. 69.  As the bankruptcy court noted, there is no evidence that GCS, Luebbert, or Atlas was contemplating—let alone in the process of—changing names.

-4-

he withheld from GCS. After interest and attorney's fees, the final judgment debt due to GCS totaled over $650,000.00.

Luebbert then filed for Chapter 7 bankruptcy, seeking to discharge the judgment debt. GCS filed an adversary proceeding in bankruptcy court demanding that Luebbert's judgment debt be declared non-dischargeable under § 523(a)(6), which exempts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity."

The bankruptcy court held a trial and ruled in GCS's favor, concluding Luebbert's debt was non-dischargeable. The bankruptcy court first applied collateral estoppel to the question of whether Luebbert injured GCS. The bankruptcy court determined that Luebbert could not contest whether GCS was injured because "[w]hen the District Court entered judgment . . . it necessarily found that [GCS] had suffered an injury." App. 652. The bankruptcy court then explained that GCS's injury was willful under our precedents because Luebbert was substantially certain he would cause GCS harm. It reasoned that Luebbert's certainty could be inferred because Luebbert "knew that he was violating the settlements" and "he intended to conceal his actions." App. 655. The bankruptcy court also found Luebbert's conduct to be malicious in light of the totality of the circumstances because Luebbert "knew about the noncompete" but still "took calculated and clandestine steps to do business with [Alliant] in violation of his obligations." App. 656–57. Pointing to Missouri law on conversion and breach of fiduciary duty, the bankruptcy court found that Luebbert's conduct "echoes of conversion or some other tort." App. 654. Luebbert appealed to the district court, which affirmed the bankruptcy court. He now appeals once more.

## II.

When a bankruptcy court's decision is appealed to the district court and then appealed again, we review only the underlying bankruptcy court decision. *Caldwell v. DeWoskin*, 831 F.3d 1005, 1008 (8th Cir. 2016). We review a bankruptcy court's

legal conclusions *de novo* and its factual determinations for clear error. *In re Porter*, 539 F.3d 889, 893 (8th Cir. 2008).

A nondischargeability action under § 523(a)(6) has three elements: (1) the debtor caused an injury to the creditor; (2) the injury must have been willfully inflicted—that is, the debtor must have desired the injury or must have been substantially certain that his conduct would result in the injury; and (3) the debtor's actions must have been malicious. *See In re Patch*, 526 F.3d 1176, 1180–81 (8th Cir. 2008). The party seeking to prevent discharge bears the burden of showing each element by a preponderance of the evidence. *Id.* at 1180. "Whether a debtor acted willfully and maliciously involves a finding of intent—a question of fact." *In re Thoms*, 505 F. App'x 603, 605 (8th Cir. 2013) (citing *In re Waugh*, 95 F.3d 706, 711 (8th Cir. 1996)).

Luebbert makes two arguments: (1) the bankruptcy court erred when it applied collateral estoppel to the issue of whether he injured GCS; and (2) the bankruptcy court erred when it failed to narrowly construe the Bankruptcy Code's exceptions to discharge and found that he inflicted a willful and malicious injury.

III.

The purpose of the collateral estoppel doctrine is to "protect[] litigants from the burden of relitigating an identical issue with the same party . . . and [to] promot[e] judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). Judgment creditors who file adversary actions in bankruptcy court to except debt from discharge can invoke collateral estoppel. *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991). Actually-litigated elements of the prior claim that are identical to the elements required for discharge can be given "collateral estoppel effect" in nondischargeability proceedings. *Id.* at 284.

The bankruptcy court applied collateral estoppel to the question of whether Luebbert's breach of contract was an "injury" as that term is used in § 523(a)(6).

The bankruptcy court was careful to explain that it was not applying collateral estoppel to determine whether that injury was willful or malicious.

Luebbert says that the operative issue in his bankruptcy case is not the same as the issue in the breach of contract action because the elements of a contract case[4] are distinct from the elements of a nondischargeability action. As this is the threshold point upon which the remainder of Luebbert's argument about collateral estoppel turns, we need answer only whether successfully showing the elements of a breach of contract is the same as proving an injury occurred within the meaning of § 523(a)(6).

Our caselaw analyzing § 523(a)(6) explains that a willful *injury* is a "deliberate or intentional *invasion of the legal rights of another*, because the word 'injury' usually connotes legal injury." *In re Geiger*, 113 F.3d 848, 852 (8th Cir. 1997) (en banc) (emphasis added), *aff'd by Kawaauhau v. Geiger*, 523 U.S. 57 (1998). So, for the bankruptcy court's application of collateral estoppel to be valid, Luebbert must have actually previously litigated the issue of whether he invaded GCS's legal rights.

We have little trouble concluding that Luebbert did so. A breach of contract case necessarily involves the question of whether the plaintiff's legal rights were violated, and the law provides a remedy for any such violation in the form of monetary damages. The principle that a breach of contract constitutes a legal injury is foundational to common law jurisprudence. We have understood for well over a century that "no act or omission of a person causes legal injury" unless it is "a breach

---

[4]A breach of contract has four elements under Missouri law: "(1) the existence of an enforceable contract; (2) the presence of mutual obligations under the contract; (3) the failure to perform an obligation specified in the contract; and (4) damages." *Sch. Dist. of Kansas City v. Bd. of Fund Comm'rs*, 384 S.W.3d 238, 259 (Mo. Ct. App. 2012).

of contract with, or of a duty to, him." *Whitwell v. Cont'l Tobacco Co.*, 125 F. 454, 463 (8th Cir. 1903).

Missouri does not depart from this ancient common law maxim. Missouri law maintains that "for every actionable injury there is a corresponding right to damages, and such injury arises whenever a legal right of plaintiff is violated." *Rusk Farms, Inc. v. Ralston Purina Co.*, 689 S.W.2d 671, 681 (Mo. Ct. App. 1985). Missouri courts have sustained breach of contract actions even in the absence of actual damages, awarding nominal damages instead. *Emerald Pointe, L.L.C. v. Jonak*, 202 S.W.3d 652, 664 (Mo. Ct. App. 2006) ("If a party fails to prove actual damages," then "proof of the existence of a contract and its breach will give rise to nominal damages"). This provides further support for the proposition that a breach of contract—even without actual damages—is a legal injury under Missouri law. So the breach of contract action against Luebbert necessarily involved the question of whether he violated GCS's legal rights. The jury verdict and judgment against Luebbert provide all the evidence necessary to conclude that he injured GCS, and the bankruptcy court's application of collateral estoppel was proper.

IV.

Luebbert next says that the bankruptcy court improperly interpreted § 523(a)(6)'s exception to discharge by construing it broadly enough to cover what the bankruptcy court described as conduct that "echoes of conversion or some other tort." App. 654. This is an issue of law we review *de novo*. *In re Porter*, 539 F.3d at 893.

Section 523(a)(6) exempts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." "Congress tells us in § 523(a)(6) that malice and willfulness are two different characteristics" and they "should not be lumped together to create an amorphous standard to prevent discharge for any conduct that may be judicially considered to be deplorable." *In re Long*, 774 F.2d 875, 881 (8th Cir. 1985). Courts considering the applicability of the

§ 523(a)(6) exception to discharge must "first determine exactly what injury the debt is for, and then determine whether the debtor both willfully and maliciously caused that injury." *In re Patch*, 526 F.3d at 1181 (cleaned up). Willfulness and maliciousness must each be shown by a preponderance of the evidence. *Id.* at 1180.

Evaluating willfulness requires an inquiry into the debtor's subjective intent to cause injury.[5] To meet the willfulness requirement, there must be "proof that the debtor desired to bring about the injury or was, in fact, substantially certain that his conduct would result in the injury that occurred." *Id.* at 1180–81 (citation omitted). This means that there must have been a "deliberate or intentional invasion of the legal rights of another." *In re Roussel*, 829 F.3d 1043, 1047 (8th Cir. 2016) (citation omitted).

Malice requires "conduct targeted at the creditor at least in the sense that the conduct is certain or almost certain to cause harm." *In re Waugh*, 95 F.3d at 711 (citation omitted). Malice is only implicated by "conduct more culpable than that which is in reckless disregard of creditors' economic interests and expectancies." *In re Long*, 774 F.2d at 880. "[K]nowledge that legal rights are being violated is insufficient to establish malice, absent some additional aggravated circumstances." *Id.* at 881 (citation omitted). "While intentional harm may be very difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent." *Id.* A robust collection of bankruptcy court and circuit court authority suggests that the point of the malice inquiry is to determine whether the debtor's conduct was "aggravated" or "socially reprehensible" such that an imputation of malice is justified. *In re Blankfort*, 217 B.R. 138, 143–44 (Bankr. S.D.N.Y. 1998) (collecting cases); *see also In re Khafaga*, 419 B.R. 539, 550 (Bankr. E.D.N.Y. 2009).

---

[5]The bankruptcy court's determination of Luebbert's intent is a factual issue we review for clear error. *In re Waugh*, 95 F.3d at 711. Luebbert does not point us to any evidence undermining the bankruptcy court's factual determinations about his intent. In fact, he concedes that "his actions may have been in bad faith." Luebbert Br. 38.

We note that while breach of contract is an injury, we cannot exempt debt for a mere knowing breach of contract from discharge. *Geiger*, 523 U.S. at 62. We have been cautioned that interpreting the Bankruptcy Code that way would be incompatible with the well-settled policy of bankruptcy law that exceptions to discharge should be narrowly construed. *Id.* Refusing to exempt from discharge debt due to a mere knowing breach of contract is also consistent with the structure of the Bankruptcy Code: 11 U.S.C. § 365(a) allows exactly that kind of breach by permitting bankruptcy trustees to reject—that is, breach—executory contracts that do not financially benefit the estate. Bankruptcy law is plainly not designed to prevent or discourage efficient breach, nor should it have that effect.[6] When a party breaches a contract solely for its own pecuniary gain and without knowledge that harm will result to its contractual partner plus "aggravated circumstances," debt arising from that breach is usually dischargeable because it is not malicious. *In re Long*, 774 F.2d at 881. "[R]eckless disregard of creditors' economic interests" is insufficient to establish malice. *Id.* at 880.

An exception to discharge under § 523(a)(6) is permissible when an "act constitute[s] an intentional injury to property of another." *Geiger*, 523 U.S. at 63. Such an act may be "depriv[ing] another of his property forever by deliberately disposing of it without semblance of authority"—but that act must be done with knowledge of its consequences or intent to bring those consequences about. *Id.* (quoting *McIntyre v. Kavanaugh*, 242 U.S. 138, 141 (1916)) (alteration added). In short, "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at 64. While the Supreme Court noted that the language of § 523(a)(6) "triggers in the lawyer's mind the category [of] intentional torts," the Court did not say that a judgment for an intentional tort was necessary to exempt judgment debt from discharge. *Id.* at 61 (citation omitted).

---

[6]*See Lockerby v. Sierra*, 535 F.3d 1038, 1042 (9th Cir. 2008) (noting that the "concept of 'efficient breach' is built into our system of contracts, with the understanding that people will sometimes intentionally break their contracts for no other reason than that it benefits them financially.").

A circuit split and much confusion have developed in *Geiger*'s wake. The Ninth Circuit determined that "to be excepted from discharge under § 523(a)(6), a breach of contract must be accompanied by some form of tortious conduct that gives rise to willful and malicious injury." *In re Jercich*, 238 F.3d 1202, 1206 (9th Cir. 2001) (citation omitted). This was because determining whether conduct accompanying a breach of contract is tortious involves reference to state law and California law understands certain kinds of breach of contract to be tortious conduct. *Id.* at 1206 n.17. But the Ninth Circuit expressly rejected "a requirement that the conduct at issue be tortious [under state law] even if a contract between the parties did not exist." *Id.* at 1206. The Ninth Circuit later clarified that conduct is "tortious if it constitutes a tort under state law" and explicitly refused to allow judgment debt for intentional breach of contract to be excepted from discharge under § 523(a)(6) unless it was "accompanied by conduct that would give rise to a tort action under state law." *Lockerby*, 535 F.3d at 1041, 1043.

The Fifth Circuit came to a different conclusion. In *In re Williams*, the Fifth Circuit held that "for a debt to be nondischargeable, a debtor must have acted with objective substantial certainty or subjective motive to inflict injury"—but expressly rejected a separate tortious conduct requirement. 337 F.3d 504, 510–11 (5th Cir. 2003) (citation omitted). The Fifth Circuit explained that "a knowing breach of a clear contractual obligation that is certain to cause injury may prevent discharge under Section 523(a)(6), regardless of the existence of separate tortious conduct." *Id.* The "injury" the Fifth Circuit considered in that case was not just the breach of contract itself, though. The court analyzed the consequences of that breach, namely "substantially certain injuries arising from violations of the [contract]" like the "blow to [the creditor's] prestige and its ability to uphold its contracts." *Id.* at 511. In the Fifth Circuit, "the dischargeability of contractual debts under Section 523(a)(6) depends upon the knowledge and intent of the debtor at the time of the breach, rather than whether conduct is classified as a tort or falls within another statutory exception to discharge." *Id.* In sum, the Fifth Circuit "require[s] explicit

-11-

evidence that a debtor's breach was intended or substantially certain to cause the [additional] injury to the creditor" to exempt the resulting debt from discharge. *Id.*

Because our circuit has not clearly defined the minimum requirements to exempt judgment debt from discharge under § 523(a)(6), several competing standards have been applied by our bankruptcy courts.[7] We have previously explained in cases dealing with judgments based in tort law that the tort at issue must meet the standards of willfulness and malice. For example, we allowed judgment debt for what we understood as a tort arising out of gross and reckless indifference to be discharged because the tort could not meet the standard for willfulness. *See In re Patch*, 526 F.3d at 1183. But *In re Patch* did not deal with a breach of contract, nor does it hold that judgment debt must arise out of a tort action to be nondischargeable. *See id.*

Analyzing the willfulness element in *In re Geiger*, we held that "for a judgment debt to be nondischargeable under [§ 523(a)(6)], it is necessary that it be *based on* the commission of an intentional tort." 113 F.3d at 853 (emphasis added). We expressed "no view . . . on the question whether it is sufficient for nondischargeability that the *judgment be for* an intentional tort." *Id.* at 853–54 (emphasis added). We now take this opportunity to clarify our jurisprudence about exceptions to discharge under § 523(a)(6) and conclude that a judgment for an intentional tort is not necessary to find judgment debt for a breach of contract nondischargeable. The willfulness requirement is met when the bankruptcy court finds facts showing that the debtor's conduct accompanying the breach of contract

---

[7]*Compare In re Iberg*, 395 B.R. 83, 89–90 (Bankr. E.D. Ark. 2008) (explaining that an "intentional breach of contract is excepted from discharge under § 523(a)(6) only when it is accompanied by malicious and willful tortious conduct"), *with In re West*, No. 16-40358-can7, 2017 Bankr. LEXIS 527, at *94 (Bankr. W.D. Mo. 2017) (holding that "the injury must be an intentional tort"), *and In re Logue*, 294 B.R. 59, 62–64 (B.A.P. 8th Cir. 2003) (explaining that "a willful breach is not enough to establish malice," but leaving open the possibility that malice can be inferred from conduct not amounting to a tort under state law).

amounted to an intentional tort against the creditor. We perceive that this aligns with the core of the analyses performed by the Ninth and Fifth Circuits.

We now consider whether Luebbert's conduct amounted to an intentional tort under Missouri law. In Missouri, conversion has three elements: (1) the plaintiff owned or was entitled to possess the property; (2) the defendant took possession of the property with the intent to exercise some control over it; and (3) the defendant thereby deprived the plaintiff of the right to possession. *See Herron v. Barnard*, 390 S.W.3d 901, 908–09 (Mo. Ct. App. 2013). Although conversion does not apply to the wrongful taking of money in Missouri, actions for conversion of "[n]otes, bills, checks, and other representatives of value can be maintained where there is evidence of the specific value of the items." *Kingfisher Hosp., Inc. v. Behmani*, 335 S.W.3d 486, 500 (Mo. Ct. App. 2011) (citation omitted) (alteration in original).

Luebbert argues that Missouri law does not support a finding of conversion on the facts of his case because "the funds were not GCS'[s] personal property" but were instead "derived from earnings [he] received from [Alliant] that he agreed to turn over to GCS under the Settlement Agreement and Amendment." Luebbert Br. 39. Luebbert fails to understand that the two-party checks he wrongfully retained and deposited were every bit as much GCS's property as his own—the parties' agreement was to split the proceeds from work done for Alliant evenly and each party had an equal right to possess the checks. In fact, the amended settlement agreement compelled Luebbert to endorse and then turn over the checks to GCS. A breach of contract and conversion both occurred when Luebbert refused to surrender the checks and instead surreptitiously deposited them for himself.

Luebbert also misunderstands conversion in Missouri. Luebbert argues that because he took money, no tort occurred because Missouri law does not authorize a conversion action when the property at issue is cash. But Luebbert converted *checks*, and checks are chattel under Missouri law. *Behmani*, 335 S.W.3d at 500. Actions for conversion of negotiable instruments are possible where there is evidence of the checks' specific value. *Id.* There was evidence of specific value here: The jury

found that Luebbert deprived GCS of $302,631.31 in checks. Missouri courts have previously allowed conversion actions in several cases where checks were withheld in violation of an agreement. *See, e.g.*, *Moore Equip. Co. v. Callen Constr. Co.*, 299 S.W.3d 678, 681 (Mo. Ct. App. 2009).

Because Luebbert's conduct accompanying his breach of contract satisfied the elements of conversion under Missouri law, he inflicted a willful injury on GCS. The facts similarly show that Luebbert knowingly and surreptitiously retained the full value of negotiable instruments he was obligated to share with GCS. By doing so, he engaged in "conduct more culpable than that which is in reckless disregard of creditors' economic interests and expectancies," and so he inflicted a malicious injury on GCS. *See In re Long*, 774 F.2d at 880. His judgment debt was therefore nondischargeable under § 523(a)(6).

Even if a judgment debt is for breach of contract, bankruptcy courts are not required to blind themselves to a willful and malicious injury inflicted on the judgment creditor. An action under Missouri state law "might contain elements of both breach of contract and conversion and be decided on either theory." *Price v. Ford Motor Credit Co.*, 530 S.W.2d 249, 255 (Mo. Ct. App. 1975). The mere fact that recovery for wrongful conduct was based in contract and not in tort—despite being possible in both under the same set of facts—does not prevent the resulting judgment debt from being exempt from discharge under § 523(a)(6). To do otherwise would fail to recognize that "[a] bankruptcy court is a court of equity" and "is guided by equitable doctrines and principles." *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 455 (1940). These principles are aimed at "securing complete justice," *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946), and bankruptcy courts have "the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done," *Pepper v. Litton*, 308 U.S. 295, 308 (1939). We will not circumscribe that power by requiring the judgment to sound in tort. It is enough to show that conduct amounting to an intentional tort accompanied the breach of contract for a creditor to meet the willful injury requirement of § 523(a)(6).

V.

Luebbert's fallback argument is that conversion "is not recognized under Missouri law as the type of tortious conduct that can arise from a contractual relationship." Luebbert Br. 40. But a brief survey of Missouri law reveals myriad cases that analyze breach of contract and conversion of property between contractual partners in tandem. *See, e.g.*, *Troxell v. Welch*, 687 S.W.2d 902 (Mo. Ct. App. 1985); *see also Aughenbaugh v. Williams*, 569 S.W.3d 514 (Mo. Ct. App. 2018). Nothing in Missouri law indicates that a party to a contract cannot convert property belonging to another simply because there is a contract between them. To the extent that Luebbert means to argue that breach of contract is not itself tortious under Missouri law unless it is accompanied by a breach of fiduciary duty, we have already clarified that the breach of contract need not be a tort itself for § 523(a)(6) to apply.

VI.

Luebbert finally asserts that, as a debtor in bankruptcy, he is a beneficiary of the debtor rehabilitation policy of bankruptcy law and so exceptions to discharge should be narrowly construed in order to favor his interest in a fresh start. Although "the underlying policy of the Bankruptcy Code is to give honest debtors a fresh start, we do not believe that we need strictly construe the provisions of the Code in favor of dishonest debtors." *In re Ophaug*, 827 F.2d 340, 343 (8th Cir. 1987). We explained in *In re Ophaug* that the debtor was "no longer entitled to the benefit of debtor rehabilitation policy considerations" once the bankruptcy court found facts sufficient to conclude the creditor met his burden to show that the debt fell within an exception to discharge. *Id*. (citation omitted). Having decided that Luebbert's conduct fell within § 523(a)(6)'s exception to discharge, we think the rationale in *In re Ophaug* applies here. The bankruptcy court found facts sufficient to conclude that Luebbert inflicted a willful and malicious injury in the course of committing his breach of contract. Because those factual determinations were challenged only insofar as they were based on a misapplication of the law—and we have determined the bankruptcy court did not misapprehend the law—Luebbert cannot point to any

reason why he should be able to claim the protection of the debtor rehabilitation policy of bankruptcy law.

The motivating policy of bankruptcy law is to protect the "honest but unfortunate debtor." *Marrama v. Citizens Bank*, 549 U.S. 365, 367 (2007) (citation omitted). Nothing in this case suggests that Luebbert is the kind of honest debtor who needs to be relieved of "the weight of oppressive indebtedness" and thereby permitted "to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (citation omitted). Luebbert is not a hapless victim of fate. His judgment debt is due to a willful and malicious injury he inflicted upon GCS and is therefore exempted from discharge under § 523(a)(6).

VII.

The judgment of the bankruptcy court is affirmed.

_____