# United States Court of Appeals
### For the Eighth Circuit

_____

No. 22-2577
_____

In re: William Howard Topp

*Debtor*

------------------------------

Farm Credit Services of America, FLCA

*Appellant*

v.

William Howard Topp, also known as Bill Topp, doing business as Bill Topp
Farm, doing business as William Topp Farm

*Appellee*

Carol Dunbar

*Trustee*
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: June 13, 2023
Filed: August 2, 2023
_____

Before GRUENDER, ARNOLD, and KELLY, Circuit Judges.
_____

GRUENDER, Circuit Judge.

This bankruptcy appeal arises from a dispute between a farmer and his creditor over their proposed repayment plan. The two could not agree on the appropriate discount rate that should apply to the farmer's deferred payments so as to satisfy the creditor's present claim. Unsurprisingly, the farmer's proposed rate was lower than his creditor's. The bankruptcy court[1] sided with the farmer. We do too.

**I.**

Farmer William Topp raises crops and livestock in Monroe County, Iowa. After several rough years, he filed for Chapter 12 bankruptcy—intended for "family farmer[s]." *See* 11 U.S.C. §§ 109(f), 101(18)(A); *see also In re Fisher*, 930 F.2d 1361, 1362 (8th Cir. 1991). Farm Credit Services of America had financed part of Topp's farm operation and filed a $595,000 claim as a secured creditor. The claim arose from five loans of various durations, with interest rates ranging from 3.5% to 7.6%. Together, the loans were secured by $1.45 million of Topp's real estate.

In Chapter 12 bankruptcy, the debtor proposes a plan to pay back his creditors from his future earnings. 11 U.S.C. § 1222(a). Secured creditors, like Farm Credit, are entitled to full payment, while unsecured creditors might receive only a portion or nothing at all. *See id.* § 1225(a)(5), (b). Once the debtor proposes a plan, the court must hold a hearing on whether to confirm it. *Id.* § 1224. The plan must accommodate each secured creditor in one of three ways: (1) by obtaining the creditor's acceptance of the plan; (2) by surrendering the property securing the claim; or (3) by providing the creditor both a lien securing the claim and a promise of future property distributions whose total value "as of the effective date of the plan" is not less than the allowed amount of the claim. § 1225(a)(5). The third is a

---

[1]The Honorable Anita L. Shodeen, United States Bankruptcy Judge for the Southern District of Iowa.

last resort, commonly referred to as the "cramdown" option because it may be enforced over a claim holder's objection. *Fisher*, 930 F.2d at 1362.

Farm Credit objected to Topp's plan, and Topp did not surrender his property. For the cramdown option, both sides have agreed to a twenty-year repayment period. But they disagree on the appropriate interest rate for determining the present value of future payments. Topp proposes starting with the twenty-year treasury bond rate (1.87% at the relevant time) and adding a 2% risk adjustment. Farm Credit opts for the national prime rate (3.25% at the time) but otherwise agrees with a 2% risk adjustment. The bankruptcy court sided with Topp and, after rounding up, found that a 4% rate was appropriate and confirmed the plan.

Farm Credit appealed to the district court,[2] which affirmed. *See* 28 U.S.C. § 158(c)(1). Farm Credit now appeals to us. *See* § 158(d).

## II.

We review only the underlying bankruptcy court decision. *In re Luebbert*, 987 F.3d 771, 778 (8th Cir. 2021). We review legal conclusions *de novo* and factual findings for clear error. *Id.*

The goal here is to ensure that the total present value of future payments to Farm Credit over the plan period equals or exceeds the allowed value of the claim. 11 U.S.C. § 1225(a)(5); *see Till v. SCS Credit Corp.*, 541 U.S. 465, 474 (2004) (plurality opinion). Farm Credit's claim is over-secured, so the whole claim is "allowed." *See* 11 U.S.C. § 506(a).

Generally, money now is worth more than money later. *See* Charles J. Woelfel, *Encyclopedia of Banking & Finance* 1131 (10th ed. 1994). Accordingly,

---

[2]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

future payments must be discounted before adding them up to see whether the total equals the present value of a claim. *Rake v. Wade*, 508 U.S. 464, 472 n.8 (1993); *Till*, 541 U.S. at 474. Discounting is achieved by applying an interest rate that captures the time value of money—often called the "discount rate." But there are no guarantees in life. A lot can happen in twenty years, and deferred payments come with risk. The debtor may not be able to pay. Or market conditions may shift unexpectedly. So a proper discount rate accounts for risk too. *See United States v. Doud*, 869 F.2d 1144, 1146 (8th Cir. 1989).

Because Farm Credit objected to Topp's plan, the bankruptcy court had to determine the appropriate discount rate to ensure that future payments would satisfy the present value of Farm Credit's claim. The parties agree that this task calls for a "market rate" or "formula" approach. *See Doud*, 869 F.2d at 1146; *Till*, 541 U.S. at 477-79. At its core, that approach says that the appropriate interest rate "should consist of a risk-free rate, plus additional interest to compensate a creditor for risks posed by the plan." *See Doud*, 869 F.2d at 1146. Farm Credit and Topp disagree over the proper risk-free starting point: the prime rate or the treasury rate. Topp cites *Doud* for the treasury rate, while Farm Credit cites *Till* for the prime rate.

Like here, *Doud* was a Chapter 12 case. But unlike here, it did not present the explicit choice between starting with the prime rate or the treasury rate. Rather, we affirmed the overall rate as not clearly erroneous because the bankruptcy court had "rationally analyzed its preference" for starting with the treasury rate and considered "all the elements" relevant to risk adjustment. *Id.* Around that time (the late 1980s and early 1990s), many courts started with the treasury rate before adjusting upward for risk. *See* 8 Collier on Bankruptcy ⁋ 1225.03 n.29 (16th ed. 2023).

*Till* came later, in 2004, and was a Chapter 13 case.[3] Until then, courts sometimes took non-formula approaches. *See* 541 U.S. at 477-78. Against those,

_____

[3]Chapter 13 plan confirmation resembles that of Chapter 12. *See* 11 U.S.C. § 1325; *see Till*, 541 U.S. at 474 & n.10. For our purposes, any distinction is

the *Till* plurality favored the formula approach, which it characterized as requiring a court to begin with the national prime rate and then adjust upward for the typically greater risk of nonpayment that bankrupt debtors pose. *Id.* at 479. According to the plurality, the prime rate "reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." *Id.*; *see* Woelfel, *supra*, at 923. Still, like *Doud*, *Till* did not explicitly analyze the merits of starting with the prime rate versus the treasury rate. The Court discussed the prime rate simply because that was what the formula-approach proponents used. As for the appropriate risk adjustment on top of the prime rate, the plurality did not decide; it merely observed that courts had generally approved adjustments of 1% to 3%. *Id.* at 480.[4]

To the extent that Farm Credit relies on *Till* for the proposition that the prime rate is *the* rate with which to start and that starting with the treasury rate is legal error, we disagree. *Doud* and *Till* are not cases about particular starting rates. They are about the proper approach to satisfying the plan-confirmation requirement that secured creditors receive at least "the value, as of the effective date of the plan," of their claims. *See* § 1225(a)(5)(B)(ii). That approach begins with risk-free or low-risk lending practices and then accounts for case-specific risk factors. *See Doud*, 869 F.2d at 1146. Naturally, the appropriate risk adjustment depends on the risk already accounted for in the starting rate. *See* April E. Kight, *Balancing the Till:*

---

immaterial, *see Hall v. United States*, 566 U.S. 506, 516 (2012), and Topp has not suggested otherwise.

[4]Justice Thomas concurred only in the judgment on the ground that the ultimate rate satisfied the statute's condition that the total payments be not less than the creditor's claim. *Till*, 541 U.S. at 491; *see* § 1325(a)(5)(B)(ii). But he did not endorse the plurality's formula approach. Instead, he believed that "[i]n most, if not all, cases, where the plan proposes simply a stream of cash payments, the appropriate risk-free rate should suffice" and no risk adjustment is necessary. *Id.* at 487. Like the plurality, Justice Thomas did not analyze the merits of starting with the prime rate versus the treasury rate.

*Finding the Appropriate Cram Down Rate in Bankruptcy Reorganizations After* Till v. SCS Credit Corporation, 83 N.C. L. Rev. 1015, 1028 (2005) ("Whereas the rate on a treasury bond is risk-free, the prime rate includes a risk premium to reflect the inherent risk of default present in a loan to the most creditworthy borrower."). In agreeing with the bankruptcy court's 2% adjustment, Farm Credit wants to keep the risk factor constant while choosing between a risk-free rate (treasury) and a *some-*risk rate (prime). This is backwards—the starting point will influence the risk adjustment. We see no legal significance to whether a court starts with a risk-free rate and adds *full* risk or starts with a *some*-risk rate and adds some more. If the court properly follows the formula approach, the ultimate discount rate, not the starting point, is what matters. *See id.*

To be sure, in *Till*'s wake, most courts start with the prime rate. *See* Alexandra Power Everhart Sickler, *Betting on the Farm: Feasible Chapter 12 Plans*, 95 Am. Bankr. L.J. 279, 305 (2021). But *Till* did not make the treasury rate obsolete as a matter of law. *See In re Texas Grand Prairie Hotel Realty, LLC*, 710 F.3d 324, 331 (5th Cir. 2013) ("*Till* was a splintered decision whose precedential value is limited even in the Chapter 13 context."); *see also* Kight, *supra*, at 1024-27. The treasury rate persists as a base rate, even if only rarely. *See, e.g.*, *In re Fuelling*, 601 B.R. 665, 674 (Bankr. N.D. Iowa 2019); *In re Vasquez*, No. 12-30834, 2012 WL 3762981, at *2 (Bankr. S.D. Tex. Aug. 29, 2012); *In re Thomas*, No. 13-44201-13, 2014 WL 1761954, at *1 (Bankr. W.D. Mo. May 1, 2014) (referring to the district's presumed Chapter 13 rate, set by local rule, which relied on treasury rates); *see also* Diane Lourdes Dick et al., *Reevaluating Risk and Return in Chapter 11 Secured Creditor Cramdowns: Interest Rates and Beyond*, 93 Am. Bankr. L.J. 175, 222 n.317 (2019) ("[W]e note that bankruptcy courts presiding over chapter 11 cases have also used the Treasury rate in recent years.").

Thus, Farm Credit's reliance on *Till* is simply a red herring—an attempt to pitch the starting-rate choice as a purely legal question calling for *de novo* review rather than what it is: a factual finding about the appropriate discount rate in this particular case reviewed for clear error. *See Doud*, 869 F.2d at 1146. After all, Farm

Credit argues that the bankruptcy court erred by "ignoring the ordinary lending practices" of the parties' particular "commercial business world," by relying on an "outdated interest rate model based on the Treasury bond yield in the 1980s," and by giving too much weight to the length of the repayment plan and the nature of the collateral.

Reviewing the bankruptcy court's factual finding for clear error, we see none. The bankruptcy court studied the *Till*/*Doud* relationship and the prevalence of post-*Till* decisions using the prime rate. The court considered the length of the proposed maturity period, the fact that Farm Credit's claim was substantially over-secured, and the overall risk of nonpayment. It specifically noted that Farm Credit's claim was secured by real estate and that those "types of transactions are generally financed over a longer period of time which justifies use of the treasury bond as the base rate." In the end, the court approved a 4% rate—the treasury rate plus 2% for risk. Note, too, that this 4% rate happens to equal the prime rate of 3.25% plus a modest risk adjustment of 0.75%. When asked at argument whether Farm Credit would have appealed *that* 4% rate, counsel demurred, suggested no, and veered back to arguing about the starting rate. By focusing on the starting rate rather than the ultimate rate, Farm Credit has failed to show that the bankruptcy court clearly erred in its determination that a 4% rate was sufficient to ensure full payment on "the value, as of the effective date of the plan," of the secured claim. *See* § 1225(a)(5)(B)(ii).

### III.

For the foregoing reasons, we affirm the judgment of the bankruptcy court.

_____